[Cite as *State v. Wells*, 2013-Ohio-3722.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   98388

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ERIC WELLS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No.   CR-536779

**BEFORE:**   Keough, J., Jones, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:**   August 29, 2013

**ATTORNEY FOR APPELLANT**

Joseph Vincent Pagano
P.O. Box 16869
Rocky River, Ohio    44116

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Saleh S. Awadallah
        Edward Fadel
Assistant County Prosecutors
Ninth Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio    44113

KATHLEEN ANN KEOUGH, J.:

**{¶1}** On May 19, 2010, defendant-appellant, Eric Wells, was indicted for the murder of Devin Webb. He was charged with aggravated murder in violation of R.C. 2903.01(A), with one- and three-year firearm specifications, and having a weapon while under disability in violation of R.C. 2923.13(A)(3). On April 23, 2012, Wells's trial commenced, and the jury heard the following evidence.

**{¶2}** In the early evening of August 14, 2006, police officers Klomfas and Miles responded to a call for a male shot in the area of West 80th Street and Detroit Road near a convenience store in Cleveland. Upon arrival, the victim, Webb, was being treated by paramedics and was transported to MetroHealth Medical Center where he was pronounced dead on arrival. Dr. Stanley Seligman, who conducted the autopsy, testified that Webb suffered three gunshot wounds — one each to his chest, hand, and wrist. According to Dr. Seligman, Webb's cause of death was multiple gunshots wounds, and the manner of death was homicide. A city of Cleveland firearm examiner testified that based on the bullet recovered, the gun used to shoot Webb was consistent with a .38 special or .357 Magnum.

**{¶3}** At the crime scene, officers and detectives interviewed witnesses, collected evidence, and assessed the area. Officer Klomfas testified that based on his initial interviews with witnesses, he learned that two people knew the shooter. He also observed security cameras affixed to a nearby building that possibly would have captured the crime. He contacted the maintenance supervisor for the building, who in turn called

the security company.  The officers were able to obtain surveillance video from three different angles showing the location where the murder occurred and footage of the victim, suspect, and eyewitness prior to, during, and after the shooting.  Detective Tom Ciula, video forensic specialist, testified that he was able to enhance the video and make still-frames of the scenes and suspect, but none of the video angles revealed the suspect's face.

{¶4} Detective Melvin Smith testified that when he arrived on scene with his partner, Detective Joselito Sandoval, he diagramed the crime scene and viewed the surveillance video, noting that the suspect had a pronounced way of swinging his arms back and forth and a limp in his walk.  He also spoke with various witnesses, including Jasmine Diaz, and made reports from those interviews.

{¶5} Diaz testified at trial that in 2006 she was a known drug user and has a criminal history. She stated that two months prior to the murder, she was at "Dave's" drinking and doing drugs when she met "Eric," who was wearing a white do-rag,[1] dark jeans, and a t-shirt; he also had dark moustache with gray spots.  She saw "Eric" again about a day or two before the murder, they discussed a letter he received from RTA about a possible monetary settlement.  "Eric" was again wearing a white do-rag, black t-shirt, blue pants, and white tennis shoes.  Diaz testified that on the day of the murder, she was buying and using crack cocaine.  She saw "Eric" again and spoke to him for a few

---

[1] The term "do-rag" and "wave cap" will be used interchangeably throughout the opinion because some witnesses identify the head covering as a "do-rag" while others use the term "wave cap."

minutes about the RTA settlement. According to Diaz, "Eric" told her that he "was working down his way to his people's house to get more money." About four or five minutes later, she heard shots being fired.

{¶6} Diaz was shown the surveillance video in open court. From the video, she identified "Eric" as the man in the white do-rag; the victim, who she knew as "Hottie" or "Teardrop"; and the other woman in the video as "Queenie." She admitted she did not witness the shooting, but said she saw "Eric" that day.

{¶7} Detective Sandoval testified that he also interviewed witnesses at the crime scene, including Gwendolyn Wiley and Lea Johnson.

{¶8} Wiley, who is also known as "Queenie," testified that she has a criminal history, and that although she has been sober from drugs for about seven years, she was a drug addict in 2006. She stated that she knew Webb as "Hottie" and a man with a slender build, a "hitched walk," salt and pepper beard, and do-rag as "Eric." On August 14, 2006, Wiley witnessed the murder of Webb. She testified that she saw Hottie going to the store, so she decided to wait for him in the street. At that point, Eric, wearing a white do-rag, approached her and asked her about drugs. She told him that Hottie might have some, but Hottie said "no." Eric then asked her, "Queenie, what's he saying?" to which she replied, quoting Hottie, "If you ain't got no money get off my damn block." Wiley stated she and Hottie started laughing about this, but Eric then ran towards Hottie and shot him.

**{¶9}** Johnson testified that she knew Webb as "Hottie." On the night of the murder, she saw Hottie walking from the corner store, and then saw a male run up to him, point a gun, and shoot the gun three times. Johnson stated that she could not see the shooter's face, but the male was wearing a white wave cap, a white t-shirt with a black shirt over it, blue jeans, and white tennis shoes.

**{¶10}** Detective John Morgan also worked the crime scene interviewing witnesses, including the Washtocks. Helen Washtock testified that on August 14, 2006, at around 7:50 p.m. she heard gunshots. When she ran to the window, she saw a black man who was wearing a white do-rag, a dark colored shirt with a white-colored shirt underneath, and blue jeans, running from the direction of the store. She said he then "jumped" into an older model car that was greenish-blue in color.

**{¶11}** Other witnesses also testified regarding what they saw that evening. Joanne Flores testified that she was about to go to the corner convenience store when she saw a young black man with a "goatee — pepper-like" wearing a white do-rag or hat and white tennis shoes and pacing around the side of the street. About 15 minutes later, she heard gunshots. She opened the curtains and saw "the dude running away" and "Hottie" lying on the ground. She saw the male who was running put a "long black gun" in the back of his pants. Although she told police that she could recognize the male again, she was never contacted by the police to look at any photo array. She was not asked at trial if Wells was the person she saw that evening.

**{¶12}** Anas Husien, the convenience store owner, testified that after he heard gunshots, he saw a man walking up the street pretty quickly tucking, what appeared to him to be a .357 gun, in the back of his pants. Husien described the man as wearing jeans, a white do-rag, and a dark shirt over a t-shirt.

**{¶13}** Based on all the interviews and observances from the surveillance video, the detectives had a consistent description of the suspect — black male, wearing a white do-rag, jeans, white tennis shoes, and white t-shirt with a black shirt over it. They also knew the suspect was named "Eric," "Will," or "Wills."

**{¶14}** The following day, Detective Sandoval interviewed David Morgan, and received from him, a wave cap that the suspect was purportedly wearing. It was unclear whether the cap was relayed as the cap the suspect was wearing that night, but Morgan affirmatively stated that the cap belonged to the suspect. Detective Smith testified the wave cap was an important piece of evidence because, at the time, no one could identify the suspect by name, and therefore, DNA on the cap could lead to an identification. Ultimately, no DNA from the cap was matched to Wells.

**{¶15}** Morgan testified that he is a known drug user and has a criminal history. He stated that on August 14, 2006, he was living off West 83rd Street and Detroit Road. He knew Webb as "Hottie" and Wiley as "Queenie." He testified that Hottie was his drug dealer, and he used to smoke with Queenie. Morgan also testified that he used to smoke with Wells and that Wells would "crash" at his apartment. He described Wells as scruffy with a slight build, salt and pepper goatee, and said dressed like a construction

worker — jeans, boots, tennis shoes, a t-shirt, flannel shirt, and a wave cap under a baseball hat.

{¶16} Morgan testified that Wells had discussed with him previously that he had a problem with a guy on West 80th. According to Morgan, it had something to do with a confrontation with Hottie and Wells's cousin. Morgan testified that Wells had spent the night at his house the night before the murder. According to Morgan, Wells told him that his cousin was supposed to come over because "they had to take care of some family business." He said that before he left the apartment. Morgan testified that Wells was wearing a white wave cap, black t-shirt, a dark flannel shirt, and jeans, and had in his possession a .357 revolver. After Wells left, Morgan heard three gunshots and then saw Wells running away from the scene.

{¶17} According to Detective Smith, the case became cold over time. Because they had surveillance video and the suspect had a distinct walk, he asked the Crimestoppers unit to assist in the investigation. Sergeant David Rutt, coordinator of the Crimestoppers unit, created a television episode with the use of the surveillance video tape. The episode aired in February 2009, and remained on the internet. After the video aired, the police received a tip on February 28, 2009, that the shooter in the video was Eric Wells.

{¶18} Detective Smith testified that based on that tip, the police refocused their investigation on the initial observation that the suspect had a pronounced limp. Detective Smith testified that after learning that the suspect was possibly Eric Wells, he

waited in an area where he knew Wells would be. As he waited, he noticed a man with a walk and mannerisms consistent with the person on the surveillance video who shot Webb. Upon further investigation, he learned that the man he observed walking was Wells.

{¶19} In March 2010, Detective Smith compiled two photo arrays, depicting Wells at time periods approximately six years apart, and showed them to Wiley and Diaz. Wiley positively identified Wells as the person she saw shoot Webb. At trial, Wiley testified that she was 100 percent certain that Wells shot Webb. Diaz also identified Wells as the person she knew as "Eric" and who she saw wearing the white do-rag and spoke to right before the murder occurred. Morgan was also shown a photo array and identified Wells as the person he saw with a gun immediately before the murder and wearing the same clothes as the suspect.

{¶20} Around that same time, Stacey Jarrell, an estranged cousin of Wells, learned that the suspect in the Crimestoppers episode was possibly Wells. When he viewed the episode over the internet, he was certain the suspect was Wells based on his mannerisms and walk. The following day he told his supervisors at the sheriff's department and made a report.

{¶21} As a result of the Crimestoppers tip, observations, and identifications, Wells was arrested for Webb's murder. After Wells was arrested and in custody at the Cuyahoga County jail, Shakim Allah, another inmate in the jail, contacted the county prosecutor's office claiming he had information regarding Wells's involvement in

Webb's death. Allah met with detectives and told them that Wells had approached him about whether Allah could locate "Queenie" and "Jasmine" in his case because he did not want them to come to court. After speaking with the detectives, Allah positively identified Wells from a photo array as the person who had approached him.

{¶22} Allah testified at trial that he had known Wells since he was kid and knew him to have a "limp." According to Allah, he spoke with Wells in 2010 and Wells asked whether he knew "Queenie," "Shay," and "Jasmine." When Allah told him "yes," Wells inquired whether he could locate or call them because he did not want them to come to court and identify him. Wells also stated he was recorded on camera. According to Allah, Wells told him that he "popped Hottie because Hottie disrespected him," and that it was allegedly payback for a robbery.

{¶23} On cross-examination, Allah admitted to his lengthy criminal history, that he had written to the prosecutor's office stating he had this information about Wells, and that he had an upcoming probation violation hearing — meaning that he wanted help with his case in exchange for information on Wells. The jury also heard that after he met with the detectives and provided this information, the prosecutor appeared at Allah's judicial release hearing and withdrew the state's previous objection for judicial release.

{¶24} While Wells was in police custody, Detectives Smith and Sandoval met with Wells to interview him. After the interview was over, Detective Sandoval used his cell phone to record Wells walking away with Detective Smith. The video was played for the

jury to corroborate Detective Sandoval's testimony that he observed Wells walking with a distinct limp.

**{¶25}** The jury returned a verdict of guilty of aggravated murder and the attendant firearm specifications, and the trial court found Wells guilty of having a weapon while under disability. The trial court merged for sentencing the firearm specifications and ordered that the corresponding three-year sentence on the specification be served prior and consecutive to the sentence of 25 years to life on the aggravated murder charge. The court also sentenced Wells to 30 months on the weapon under disability charge, ordering that the sentence be served concurrently with the aggravated murder sentence.

**{¶26}** Wells now appeals, raising six assignments of error.

## I. Speedy Trial

**{¶27}** From the time of Wells's arrest in April 2010 until his trial commenced in April 2012, Wells did not waive his right to a speedy trial. The record reveals that Wells, pro se, raised the issue of speedy trial at least five different times during the pendency of his case, with the earliest instance on November 5, 2010. Even so, the trial court only addressed Wells's concerns on one occasion when the court explained why the triple-count provision of R.C. 2945.71(E) did not apply. Accordingly, in his first assignment of error, Wells contends that his constitutional and statutory speedy trial rights were violated.

**{¶28}** Whether a trial court's ruling on a speedy trial question was correct presents a mixed question of law and fact. *State v. Borrero*, 8th Dist. Cuyahoga No. 82595,

2004-Ohio-4488, ¶ 10, citing *State v. Barnette*, 12th Dist. Fayette No. CA2002-06-011, 2003-Ohio-2014. Appellate courts apply a de novo standard of review to the legal issues but afford great deference to any findings of fact made by the trial court, if supported by competent and credible evidence. *State v. Barnes*, 8th Dist. Cuyahoga No. 90847, 2008-Ohio-5472, ¶ 17. This court must construe the statutes strictly against the state when reviewing the legal issues in a speedy trial claim. *Brecksville v. Cook*, 75 Ohio St.3d 53, 57, 1996-Ohio-171, 661 N.E.2d 706. Morover, in analyzing the procedural timeline record of the case, this court is required to strictly construe any ambiguity in the record in favor of the accused. *State v. Johnson*, 8th Dist. Cuyahoga Nos. 78097, 78098, and 78099, 2001 Ohio App. LEXIS 999, *6 (Mar. 8, 2001).

**{¶29}** In this case, Wells sets forth two speedy trial claims — statutory and constitutional.

### A. Statutory Speedy Trial Right

**{¶30}** R.C. 2945.71 requires the state to bring a felony defendant to trial within 270 days of arrest. Each day a defendant is held in jail in lieu of bail solely on the pending charge is counted as three days. R.C. 2945.71(E).

**{¶31}** If a defendant is not brought to trial within the speedy trial limits, the court, upon motion, must discharge the defendant. R.C. 2945.73(B). A defendant establishes a prima facie case for discharge based on a speedy trial violation when he or she demonstrates that more than 270 days elapsed before trial. *See State v. Butcher*, 27 Ohio St.3d 28, 500 N.E.2d 1368 (1986). The burden then shifts to the state to show R.C.

2945.72 extended the time limit. *Brecksville*, 75 Ohio St.3d at 55-56, 1996-Ohio-171, 661 N.E.2d 706.

**{¶32}** In this case, 734 days elapsed between the date of Wells's arrest on April 21, 2010, and the date of trial, April 24, 2012. He established, therefore, a prima facie case of a speedy trial violation. The burden now shifts to the state.

**{¶33}** Under R.C. 2945.72, the time within which an accused must be brought to trial is extended for various reasons, including motions filed by the accused, continuances requested by the accused, the time required to secure counsel for the accused, and reasonable continuances granted other than upon the accused's motion. *See, e.g., State v. Byrd*, 8th Dist. Cuyahoga No. 91433, 2009-Ohio-3283; *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283; *State v. Pirkel*, 8th Dist. Cuyahoga No. 93305, 2010-Ohio-1858.

**{¶34}** This case presents an interesting set of facts and circumstances that could affect the calculation of speedy trial. As previously stated, the record reveals that Wells, pro se, raised the issue of speedy trial at least five different times during his case. The earliest instance Wells challenged his right to a speedy trial was in his pro se motion filed on November 5, 2010. Although the issue was raised, neither the State nor the trial court addressed the issue — presumably because Wells was represented by counsel. On January 14, 2011, Wells moved to disqualify his trial counsel, and on January 24, the trial court conducted a hearing on that motion. When Wells expressed concern about his speedy trial rights during he hearing, specifically the effect of the probation violation hold

in CR-525073 on his right to a speedy trial in the murder case, the following colloquy occurred between Wells and the court:

> Wells: What about the — my 2945.17 statutory speedy trial right and this probation hold? You know, what I'm — I don't understand, why is I being held so long without trial, 270 days? I've been incarcerated for 270 days.
>
> Court: You can have your attorneys explain that to you. I'll get you new attorneys. You're running one for one. You don't get three for one when you're being held under two cases. Right now you're a potential probation violation, depending on this case.
>
> Wells: But the case, Your Honor, the case is — I was on probation in 2010, March, 2010, but the case supposedly happened in 2006, so where is the violation?
>
> Court: When did the charges come?
>
> Wells: The charges came —
>
> Court: May 19, 2010 is when it was filed with the State of Ohio, with the pro — with the Clerk of Courts office.

{¶35} Accordingly, the first issue, which was raised by the defendant, pro se, with the trial court, was the effect the probation violation case had on Wells's speedy trial calculation for the murder case. Specifically, he argued that if the court was using the new murder charge as the predicate for the probation violation, the court was in error. He contended that because the murder offense occurred in 2006 before he was placed on probation in 2010, no violation could be found and any probation hold or capias issued based on the new murder charge was invalid. Therefore, Wells argued, the triple-count provision under R.C. 2945.71 should apply in calculating his speedy trial time on the murder indictment.

**{¶36}** "The provisions of [R.C.] 2945.71 that accelerate the speedy trial requirements apply only to one held in jail in lieu of bail solely on the pending charges." *State v. Thompson*, 97 Ohio App.3d 183, 186, 646 N.E.2d 499 (6th Dist.1994), citing *State v. MacDonald*, 48 Ohio St.2d 66, 70, 357 N.E.2d 40 (1976) "Where, in addition to the pending charges, a defendant is held for a parole or probation violation, the acceleration of time is not triggered." *Thompson*, citing *State v. Phillips*, 69 Ohio App.3d 379, 381, 590 N.E.2d 1281 (1st Dist.1990). Thus, the existence of a probation holder prevents application of the triple-count provision. *State v. Brown*, 64 Ohio St.3d 476, 479, 1992-Ohio-96, 597 N.E.2d 97; *State v. Jones*, 81 Ohio App.3d 348, 350-351, 611 N.E.2d 329 (11th Dist.1992).

**{¶37}** In *State v. Kustron*, 8th Dist. Cuyahoga No. 77102, 2000 Ohio App. LEXIS 5094 (Nov. 2, 2000), this court found that when a probation holder is used to circumvent the triple-count provision of speedy trial, the validity of the probation holder is the deciding factor. *Id*. at *16.

**{¶38}** Our determination of the underlying issue, whether the triple-count provision applies, does not require an analysis of the specific issue raised by Wells — whether alleged pre-probation misconduct can be used as a basis for a probation violation in a subsequent arrest for that alleged misconduct.

**{¶39}** It is important to note that Wells did not appeal CR-525073, the probation case. Therefore, the probation record is not before this court. However, due to the issues raised pro se with the trial court, this court allowed the state to supplement the

record to include a certified copy of the docket of the probation case and an affidavit from Wells's probation officer explaining the alleged violation. The supplemental record demonstrates that the predicate for the alleged probation violation was an alleged drug-positive urinalysis. Therefore, it is inconsequential whether the trial court was correct in its statement that the pending murder charge was the basis for the violation or whether Wells could be found in violation of his probation if convicted on the murder offense. Because Wells was also being held on an alleged probation violation not related to the pending murder case, he was not being held solely on the murder charge, and the triple count provision under R.C. 2945.71(E) does not apply. Whether the probation violation hold or capias was valid is not before this court.

{¶40} The second issue, which this court raised sua sponte and requested additional briefing on from the parties, was whether the state could continue using the alleged probation violation in CR-525073 as justification for the speedy trial time on the murder case to run one-for-one after Wells served the maximum penalty he could have received if he was found to be in violation of his probation.

{¶41} The supplemental record shows that Wells was convicted in CR-525073 of drug trafficking, a fifth-degree felony, and was placed on one-year of community control sanctions. The terms and conditions of community control included "[s]ubmit to random drug testing." The sentencing journal entry provides that a violation of probation could "result in more restrictive sanctions, or a prison term of 12 month(s) as approved by law."

Accordingly, the maximum penalty Wells could have received for violating his probation was one year in prison.

**{¶42}** Wells was arrested on the alleged probation violation on April 19, 2010. Therefore, if the maximum penalty of one year was imposed if he was found in violation of his probation, he would have been released from jail on or about April 19, 2011. However, the supplemental record reflects that no activity, including any probation violation hearing, occurred on his probation case from the time he was arrested on the alleged violation until April 30, 2012, when the trial court terminated Wells's probation after he was found guilty on the aggravated murder charge. Whether this inactivity violated Wells's due process rights on the probation case, and thus affected the validity of the probation hold or capias, is not before this court because, again, Wells did not appeal his probation case. Therefore, any challenge concerning the legality of the probation hold or capias, or whether Crim.R. 32.3 or R.C. 2951.08 were followed, cannot be considered by this court.

**{¶43}** Because Wells was being held on two offenses, and the inactivity on the probation case cannot be considered, we find that the State did not violate his statutory right to a speedy trial.

**{¶44}** "'The statutory time period begins to run on the date the defendant is arrested; however, the date of arrest is not counted when computing the time period.'" *State v. Tatum*, 3d Dist. Seneca No. 13-10-18, 2011-Ohio-3005, ¶ 24, quoting *State v. Maisch*, 173 Ohio App.3d 724, 2007-Ohio-6230, 880 N.E.2d 153, ¶ 26 (3d Dist.)

**{¶45}** In this case, Wells's statutory speedy trial time began to run on the day of his arrest, which according to the record was April 21, 2010. At that time, Wells was already in custody on the alleged probation violation. Therefore, from April 22 to May 27, the day Wells filed a request for a bill of particulars, 36 days had passed. The time period was tolled until December 1, 2010, due to discovery demands, and motions to continue and suppress filed and requested by Wells. On December 1, the court was scheduled to conduct a pretrial; however, the docket does not indicate that any action was taken. Therefore, from December 1, 2010, until January 3, 2011, when the case was continued by joint request for DNA results, another 29 days had passed, for a total of 69 days. The time is then tolled again until June 7, 2011, due to appointment of new trial counsel for Wells, additional discovery demands, and motions to continue filed and requested by Wells. On June 7, the court was scheduled to conduct a final pretrial, with trial scheduled for July 18; however, the docket does not indicate that any action was taken. Therefore, from June 7 until July 18, when the state requested a continuance of trial due to officer unavailability, another 41 days had passed, for a total of 110 days. Trial was rescheduled to October 11, 2011. However, during this time Wells filed motions in limine and to voir dire identification witnesses. Therefore, the time was tolled from July 18, 2011, until November 4, 2011, after all the hearings were conducted on Wells's motions.

**{¶46}** The speedy trial clock starts back up again on November 4, 2011, when the court continued the pretrial at its request until November 16 without any indication on the

record regarding the basis for the continuance. A sua sponte continuance must be properly journalized before the expiration of the speedy trial period and must set forth the court's reasons for the continuance. *Pirkel*, 8th Dist. Cuyahoga No. 93305, 2010-Ohio-1858, at ¶ 16, citing *State v. Weatherspoon*, 5th Dist. Richland No. 2006CA0013, 2006-Ohio-4794. "'The record of the trial court must * * * affirmatively demonstrate that a sua sponte continuance by the court was reasonable in light of its necessity or purpose.'" *Pirkel* at ¶ 16, quoting *State v. Lee*, 48 Ohio St.2d 208, 209, 357 N.E.2d 1095 (1976). Further, the issue of what is reasonable or necessary cannot be established by a per se rule, but must be determined on a case-by-case basis. *Pirkel* at ¶ 17, citing *State v. Saffell*, 35 Ohio St.3d 90, 518 N.E.2d 934 (1988).

{¶47} Therefore, because no basis for the continuance was set forth in the journal entry and construing the speedy trial time in favor of Wells, the continuance is not counted against Wells. Accordingly, from November 4, 2011, until November 16, another 12 days passed, for a total of 122 days.

{¶48} On November 16, the court again continued the case for pretrial, and the journal entry does not identify who requested the continuance or the basis. Therefore, this continuance is also not counted against Wells. Accordingly, from November 16 until November 29, another 13 days passed, for a total of 135 days.

{¶49} On November 29, the court again continued the case for a final pretrial on January 4, 2012, without any indication who requested the continuance or the basis.

Therefore, the continuance is not counted against Wells, and from November 29 until January 4, 2012, 36 additional days passed, for a total of 171 days.

{¶50} On January 4, 2012, the trial court set the trial for February 27, 2012. During this time, the state's motion for other acts evidence was considered. Because trial was scheduled, any continuances granted during this period are not counted against Wells. However, on February 27, the state orally moved to continue the trial over objection. Although the journal entry does not reflect the basis for the continuance, the transcript of the hearing reflects that the state's eyewitness was unavailable for trial due to surgery. Accordingly, the record reflects that the basis for the continuance was reasonable and trial was continued to April 23, 2012. Therefore, from January 4 to February 27, another 54 days had passed, for total of 225 days, but because the basis for the continuance was reasonable, the time was tolled from February 27 to April 23.

{¶51} Trial was scheduled to commence on April 23; however, the state moved to continue the trial to April 24. No basis or justification was given. Therefore 1 day passed, for a total of 226 days. Trial began on April 24, 2012.

{¶52} Accordingly, only 226 days are attributable to the state for speedy trial purposes and because Wells was brought to trial within 270 days of his arrest, his statutory right to a speedy trial was not violated.

B. Constitutional Speedy Trial Right

{¶53} The statutory speedy trial provisions of R.C. 2945.71 and the constitutional guarantees found in the Ohio and United States Constitutions are coextensive. *See State v.*

*King*, 70 Ohio St.3d 158, 160, 1994-Ohio-412, 637 N.E.2d 903; *State v. O'Brien*, 34 Ohio St.3d 7, 516 N.E.2d 218 (1987). Because we have found no statutory speedy trial violation in Wells's case, the burden is upon him to demonstrate that his constitutional right to a speedy trial has been denied. *State v. Gettys*, 49 Ohio App.2d 241, 244, 360 N.E.2d 735 (3d Dist.1976); *State v. Bound*, 43 Ohio App.2d 44, 47, 332 N.E.2d 366 (8th Dist.1975)

**{¶54}** "The constitutional right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution." *State v. Kutkut*, 8th Dist. Cuyahoga No. 98479, 2013-Ohio-1442, ¶ 10, citing *State v. Carmon*, 8th Dist. Cuyahoga No. 75377, 1999 Ohio App.LEXIS 5458, *3 (Nov. 18, 1999). "'The statutory time requirements of R.C. 2945.71 to 2945.73 are not relevant to a determination of whether a defendant's constitutional right to a speedy trial has been violated by an unjustified delay in prosecution.'" *Id.*, quoting *Carmon* at *4. Instead, courts should employ the balancing test of the factors enunciated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530-533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The factors to be weighed include: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial right; and (4) prejudice to the defendant. *Kutkut* ¶ 10, citing *Carmon* at *4-5. No single factor is regarded "* * * as either a necessary or sufficient condition to the finding of a deprivation to the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker* at 533.

**{¶55}** Although Wells briefly asserted that he had been denied his constitutional right to a speedy trial in his pro se motions, his arguments below and on appeal focus upon his statutory speedy trial rights, and he fails to make any argument or address the *Barker* factors on appeal. App.R. 16(A) requires a party to separately argue each assignment of error. Pursuant to App.R. 12(A)(2), an appellate court may disregard any assignment of error, or portion thereof, if the appellant fails to make a separate argument. *See State v. Newberry*, 77 Ohio App.3d 818, 820, 603 N.E.2d 1086 (4th Dist.1991).

**{¶56}** Moreover, Wells has failed to withstand his burden by failing to address the *Barker* factors. *See, e.g., State v. Winn*, 8th Dist. Cuyahoga No. 98172, 2012-Ohio-5888, ¶ 43 (defendant must first make a threshold showing of "presumptively prejudicial" delay to trigger application of *Barker* analysis). Therefore, because Wells did not develop the issue regarding his constitutional right to a speedy trial in the trial court or here on appeal, an analysis under *Barker* is unnecessary. *State v. Stokes*, 193 Ohio App.3d 549, 2011-Ohio-2104, 952 N.E.2d 1192, ¶ 9 (12th Dist.), citing *State v. Russell*, 4th Dist. Athens No. 97 CA 37, 1998 Ohio App.LEXIS 3176, *12 (June 30, 1998).

**{¶57}** Wells's first assignment of error is overruled.

## II. Motion to Suppress

**{¶58}** In his second assignment of error, Wells argues that he was denied due process when the trial court erroneously limited the scope of the hearing related to his motion to suppress identification testimony. He also contends that the trial court erred in

denying his motion to suppress because the photo arrays used were unduly suggestive and unreliable, and any witness identification made based on the Crimestoppers video was unreliable.

**{¶59}** A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accordingly, we give deference to the trial judge's factual findings, but we review the application of law to fact de novo. *Id.*; *see also State v. Davis*, 8th Dist. Cuyahoga No. 83033, 2004-Ohio-1908.

## A. Limited Scope of Hearing

**{¶60}** Wells first contends that the trial court erroneously limited the scope of the voir dire of witnesses to only whether the photo array was unduly suggestive, and did not allow him to question the witnesses regarding reliability.

**{¶61}** In support of his argument, he relies on *State v. Glover*, 8th Dist. Cuyahoga No. 84413, 2005-Ohio-1984. In *Glover,* only the officers who assembled and presented the photo arrays were permitted to testify — the trial court believed the identification witnesses's testimony was irrelevant as to suggestiveness. *Id.* at ¶ 15. This court held that by refusing to hear testimony from anyone other than the officers, the trial court denied the defendant the opportunity to present testimony that may have conflicted with that of the officers regarding the procedures employed in presenting the photo arrays to those witnesses. *Id.* at ¶ 20. This refusal was particularly egregious because the

defendant bears the burden of proving that the out-of-court identification was flawed. *Id*. at ¶ 21.

{¶62} However, the facts in this case are distinguishable because the detectives who made and presented the photo arrays testified, and the identification witnesses also testified regarding the procedures used when the officers presented the photo arrays them. Therefore, unlike in *Glover*, there were no due process violations.

{¶63} An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In determining the admissibility of challenged identification testimony, a reviewing court applies a two-prong test: (1) did the defendant demonstrate that the identification procedure was unduly suggestive; and, if so, (2) whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19, citing *State v. Wills*, 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist.1997); *see also State v. Thompson*, 8th Dist. Cuyahoga No. 90606, 2009-Ohio-615, ¶ 32, citing *State v. Page*, 8th Dist. Cuyahoga No. 84341, 2005-Ohio-1493. If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Wills* at 325.

**{¶64}** The record demonstrates that the trial court only accepted testimony from the witnesses on whether the identification procedures and array assemblage were unduly suggestive. The record seems to indicate that if Wells withstood his burden that those procedures were unduly suggestive, the court was going to allow testimony on the reliability of the identifications. After hearing testimony from the witnesses, the trial court determined that the identification procedures employed in the photo array identifications were not unduly suggestive. Accordingly, as will be further discussed below, Wells did not withstand his initial burden of establishing that the identification procedure was unduly suggestive and limiting the hearing was therefore not in error.

### B. Photo Array Identification Pre-R.C. 2933.83

**{¶65}** After Detective Smith learned of a possible suspect in 2010, he contacted the Cleveland Photo Lab and a six-pack photo array was created. A second photo array was also established from pictures obtained from the sheriff's department. Detective Smith testified that the purpose for preparing two photo arrays was because he wanted to depict Wells at two different times in his life with different facial hair so the witnesses could be certain of the identification.

**{¶66}** The first photo array is a six-pack of black and white photographs all appearing on a single piece of paper. Detective Smith testified that he inspected the array and was satisfied with the quality of the array, although he agreed that Wells's photograph in this array appeared lighter than the others but was unsure why. Each photograph in the array is of a black male with short hair and a moustache. Wells's

photograph was fourth in the array. Other than the lighting of Wells's photograph, no other factors are present distinguishing Wells's photograph from the others in the first array.

{¶67} The second photo array also contains six photographs, but the photographs are in color and each picture is on a separate piece of paper. Detective Smith agreed that Wells has silver and gray coloring in his beard, whereas the others do not. Additionally, the background behind Wells appears lighter. Each photograph contains a black male with short hair and some variation of facial hair. Wells's photograph was again in the fourth position for Detective Smith's "organizational consistency." Moreover, Wells's photograph was the only photograph contained in both arrays.

{¶68} Wells first contends that the procedures used and the photo arrays shown to Gwendolyn Wiley and Jasmine Diaz were impermissibly suggestive because (1) the color of his photograph in the first array was lighter than the others and the background color of his photograph in the second array was lighter than the background color of the others, (2) he is the only person pictured in the second photo array with a silver and gray beard, and (3) in both arrays his picture was placed in the fourth position.

{¶69} Where the men depicted in the photo array with the defendant all appear relatively similar in age, features, skin tone, facial hair, dress, and photo background, the photo array is not impermissibly suggestive. *State v. Jacobs*, 7th Dist. Mahoning No. 99-CA-110, 2002-Ohio-5240, ¶ 18. Generally a photo array is not unduly suggestive due solely to different backgrounds. *See State v. Carter*, 2d Dist. Montgomery No. 21145,

2006-Ohio-2823, ¶ 33, citing *State v. Nelson*, 8th Dist. Cuyahoga No. 81558, 2003-Ohio-3219; *but see State v. Johnstone*, 8th Dist. Cuyahoga No. 92885, 2010-Ohio-1854 (lighter background color of defendant's picture contributed to flawed identification procedure.)

{¶70} Detective Smith testified that he met with Wiley and advised her to look at the photo array to see if there was anyone she recognized and if so, who it was and how she recognized the individual. According to Detective Smith he handed Wiley the photo array and stepped back; she identified Wells in photograph number 4 as the man who shot Webb.

{¶71} Wiley testified that Detective Smith did not say or indicate who to pick or that any particular person was in the photo array. Wiley said that she viewed the black and white photo array first and was asked by Detective Smith to identify anyone in the picture that she knew or had seen before. She then pointed out the person in fourth position and identified him as the "the man that I saw shot [sic] the other man." She then looked at the second photo array of the individual pictures and identified the "man" in position four with the "white background." Wiley testified that the background color of the photograph did not help her identify Wells from the photo array and she was sure the person pictured in photograph number 4 was the person she saw on the day of the murder.

{¶72} Detective Smith testified that he met with Jasmine Diaz and gave her the same instructions that he gave Wiley. According to Diaz, Wiley identified Wells in photograph number 4 as the man she talked to prior to the homicide.

{¶73} Diaz testified that Detective Smith did not suggest to her who to pick, but "to do my best in picking out who looked familiar." She then looked at the black and white array first and picked photograph number 4 and identified him as "Eric." She stated that she saw him the day before and the day of the shooting. She also identified Wells in photograph number 4 in the second array. Although Diaz admitted that Wells's photographs appeared lighter, she stated that she "can never forget a face with or without a do-rag."

{¶74} There was no testimony by any witness that the positioning of Wells's photograph in the second photo array influenced the witnesses's identifications. Both Wiley and Diaz identified Wells as the person they saw the day that Webb was shot and identified him in the first photo array. The fact that Wells's photograph was also the fourth photograph in the second array does not negate the positive identification in the first photo array. Morever, the fact that the two photo arrays placed the intended suspect in the same numerical position is not unduly suggestive. *State v. Sealy*, 10th Dist. Franklin No. 09AP-1128, 2010-Ohio-6294, ¶ 29.

{¶75} Accordingly, neither the photo arrays nor the identification procedures employed were impermissibly suggestive to warrant suppression of the out-of-court identifications by Wiley and Diaz.

C. Photo Identification Post-R.C. 2933.83

{¶76} In July 2010, R.C. 2933.83 was enacted and changed the procedures regarding live or photo lineup identifications. Accordingly, this new law applied to the

out-of-court photo array identifications made by David Morgan and Shakim Allah. Wells argues that the "blind administrator" procedure was not followed because the "folder system" was not used pursuant to R.C. 2933.83(A)(2). Because this procedure was not followed, Wells argues that the out-of-court identifications by Morgan and Allah should have been suppressed.

{¶77} First, the statute does not require the use of the "folder system"; rather the "folder system" is one system that can be used by law enforcement for photo lineups. *See* R.C. 2933.83(A)(6) and (D); *State v. Winters*, 6th Dist. Lucas No. L-12-1041, 2013-Ohio-2370, ¶ 42.

{¶78} Instead, the statute requires any law enforcement agency or criminal justice entity that conducts live or photo lineups to adopt specific procedures for conducting the lineups. *State v. Alexander*, 8th Dist. Cuyahoga No. 98941, 2013-Ohio-2533, ¶ 25, citing *State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶ 5. The procedures include the use of "a blind or blinded administrator" to conduct a live or photo lineup, and a written record of the lineup that includes all results obtained during the lineup, the names of all persons at the lineup, the date and time of the lineup, and the sources of the photographs used in the lineup. *Alexander* at ¶ 25. Further, if a blind administrator is used, the administrator is required to inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know the identity of the suspect. *Id.*

**{¶79}** Accordingly, the fact that the detectives in this case did not utilize the "folder system" does not necessarily mean that a "blind administrator" was also not used. Upon review of the suppression hearing, we find that a "blind administrator" was used because both Detective Frank Bodi and Sergeant Michael Quinn testified and indicated on the written record that they did not know the suspect.

**{¶80}** The trial court, in finding both Morgan and Allah's identifications admissible, stated: "[t]he Court is going to find that notwithstanding the fact that [the officers] did not follow the procedure, in what the Court would deem to be the non-mandatory section, that being the definitions, they are nonetheless in substantial compliance with (B) and — (B)(1), (2), (3), (4), and (5)." However, our review of the record indicates that the administrators deviated from the requirements of R.C. 2933.83(B) when presenting the photo lineups to Morgan and Allah.

**{¶81}** Regarding the identification made by Morgan, a review of the written record that Detective Bodi completed reveals deviations from the requirements of R.C. 2933.83(B). Specifically, the administrator did not have Morgan sign the written record that contained the results of who he identified. (R.C. 2933.83(B)(4)(a)). Additionally, it does not indicate who was present during the photo lineup identification procedure. (R.C. 2933.83(B)(4)(b)).

**{¶82}** Regarding the identification made by Allah, the written record completed by Sergeant Quinn also reveals deviations. Specifically, the administrator did not mark on the written record which photograph Allah identified or his confidence statements;

rather, the administrator wrote on the corresponding line next to "photograph #4" under "remarks": "recognize[d] for this case." (R.C. 2933.83(B)(4)(a)).

{¶83} While the trial court found that the administrators substantially complied with the mandatory procedures under R.C. 2933.83(B), our review of the case law does not indicate that substantial compliance is sufficient. Nevertheless, the "penalty" for failure to comply with R.C. 2933.83 is a potential jury instruction regarding the noncompliance, not immediate suppression.

{¶84} Under R.C. 2933.83(C)(1), evidence of a failure to comply with the required procedures "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." *See also Alexander*, 8th Dist. Cuyahoga No. 98941, 2013-Ohio-2533, at ¶ 27. "R.C. 2933.83(C)(1), however, does not provide an independent basis upon which to suppress evidence, and a trial court errs in solely relying on the statute in suppressing an identification." *State v. Sails*, 2d Dist. Montgomery No. 24733, 2012-Ohio-4453, ¶ 30. "The overriding analysis remains whether the procedure was 'impermissibly suggestive.'" *State v. Henry*, 6th Dist. Lucas No. L-11-1157, 2012-Ohio-5552, ¶ 46, citing *Biggers*, 409 U.S. at 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶85} In this case, both Morgan and Allah were shown the six-pack black and white photo array also shown to Wiley and Diaz. As previously determined, the array itself is not impermissibly suggestive.

{¶86} David Morgan was in police custody in Geauga County, Ohio when he was presented with the photo array. Detective Bodi of the Geauga County Sheriff's Department testified that he acted as the blind administrator in presenting the photo array to Morgan. August 22, 2013He testified that he handed one envelope to Morgan, advised him of the required language that the suspect's photograph may or may not be in the array, and then backed away from Morgan. According to Detective Bodi, Morgan then opened the envelope and picked Wells's photograph.

{¶87} Morgan testified that when he saw the Cleveland police officers, he knew it was about the "murder on 80th." According to Morgan, Detective Bodi put the photographs in front of him, read him the required language that the suspect may or may not be in the array, and told him to identify the murder suspect. He then picked photograph number 4 as Eric Wells and told the detective he was 80 percent certain it was him. He stated that no one or nothing in the photo arrays influenced him to pick Wells.

{¶88} Regarding the identification made by Allah, Sergeant Quinn acted as a blind administrator, and the identification process was recorded on video. Sergeant Quinn advised Allah that the suspect may or may not be in the array and then presented Allah the black and white photo array. Sergeant Quinn told him to pick out someone he recognized, and Allah pointed to photograph number 4, stating he "recognize[d] for this case."

{¶89} Allah testified that he was interviewed by Detectives Smith and Sandoval regarding information he had about the murder of Webb and Wells's involvement. After

speaking with them, another officer entered the room and showed him a photo array. Allah testified that he picked photograph number 4 and stated he "recognize[d] for this case." He stated the administrator gave him some instructions, but did not suggest who to pick.

{¶90} From this record, nothing indicates that the procedures employed by the administrators were unnecessarily suggestive such that the identifications were unconstitutionally obtained leading to a misidentification. Accordingly, the trial court did not err in denying Wells's motion to suppress Morgan and Allah's out-of-court identifications.

### D. Identification by Stacy Jarrell

{¶91} Wells's final challenge regarding suppression involves the out-of-court identification made by Stacy Jarrell from the Crimestoppers video. He contends that the identification was wholly unreliable under the totality of the circumstances because Jarrell's identification was made only after he heard family members saying that Wells was the person in the video and that Jarrell, who had seen Wells once in 25 years, based his identification on Wells's walk.

{¶92} We note that a motion to suppress was not the proper vehicle to exclude Jarrell's identification testimony. Any objection to this evidence was properly raised in a motion in limine and not in a motion to suppress, which is reserved for constitutional violations. *Hilliard v. Elfrink*, 77 Ohio St.3d 155, 158, 1996-Ohio-333, 672 N.E.2d 166; *see generally State v. French*, 72 Ohio St.3d 446, 1995-Ohio-32, 650 N.E.2d 887.

**{¶93}** Unlike a photo array identification where the state, through the use of law enforcement, is involved in the identification, Jarrell's viewing of the Crimestoppers video was done independently and not at the request of law enforcement.

**{¶94}** Therefore, we consider the voir dire testimony by Jarrell of his out-of-court identification as given under a motion in limine, which was denied. During Jarrell's trial testimony, the court noted Wells's continuing objection regarding Jarrell's testimony and his identification from the Crimestoppers video. As will be discussed in Wells's fourth assignment of error, the trial court did not abuse its discretion in allowing Jarrell to testify regarding his identification of Wells from the Crimestoppers video.

**{¶95}** Accordingly Wells's second assignment of error is overruled.

### III. Jury Instruction

**{¶96}** In his third assignment of error, Wells argues that the trial court erred by not instructing the jury on the failure to comply with photo lineup procedures in accordance with R.C. 2933.83.

**{¶97}** The record demonstrates that defense counsel did not object to the instructions the jury received in this case. Accordingly, we address this assignment of error under the plain error standard. *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364 (1977) (a failure to object at trial constitutes a waiver of all but plain error on the issues on appeal). Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be an error that is plain or obvious that

affected the outcome of the case. *In Re: J.G.*, 2013-Ohio-583, 986 N.E.2d 1122, ¶ 10 (8th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Courts are to notice plain error under Crim.R. 52(B) "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*.

**{¶98}** As previously discussed under Wells's second assignment of error, the "penalty" for failing to comply with R.C. 2933.83 comes in the form of a potential jury instruction. Specifically, R.C. 2933.83(C)(3) provides,

> When evidence of a failure to comply with any of the provisions of this section, or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section, *is presented at trial*, the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup. (Emphasis added).

**{¶99}** As the statute clearly states, in order to invoke the "penalty," evidence or testimony regarding noncompliance must be brought forward during trial. *State v. Thompson*, 4th Dist. Vinton No. 12CA688, 2013-Ohio-2235, ¶ 24, citing *Henry*, 6th Dist. Lucas No. L-11-1157, 2012-Ohio-5552, at ¶ 46 ("[o]nly if such evidence is introduced at trial does the statute require a jury instruction."); *see also State v. Bryson*, 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934, ¶ 56 (deviations in photo lineup procedures under R.C. 2933.83 could be presented by the defense to the jury). In this case, no testimony or evidence was presented at trial regarding the deviations from R.C. 2933.83 in the photo lineup procedures employed with Morgan and Allah.

{¶100} Without any evidence before the jury demonstrating noncompliance, the trial court was not required to give an instruction. Moreover, the trial court gave the standard general instruction on credibility of witnesses and weighing the testimony of identifying witnesses, including "all surrounding circumstances under which the witness has identified the defendant, including deficiencies, if any, photo displays, or one-on-one Ids [sic]." This standard instruction provided guidance to the jury to consider the circumstances surrounding the identification.

{¶101} Accordingly, we find no merit to Wells's third assignment of error and it is overruled.

## IV.   Inadmissible Evidence

{¶102} Wells argues in his fourth assignment of error that he was denied a fair trial when the trial court allowed inadmissible evidence to be introduced at trial. Wells specifically challenges on appeal the admissibility of the pretrial identification testimony, the video Detective Sandoval took of Wells in jail clothing, all videos and reports prepared by Detective Ciula because they were not actual video surveillance, and Stacy Jarrell's identification testimony. He contends that the evidence was inadmissible pursuant to Evid.R. 403 because the probative value was substantially outweighed by the prejudicial effect.

{¶103} Evidence that is admitted over an appellant's objection at trial is subject to an abuse of discretion standard. A trial court has broad discretion in determining whether to admit or exclude evidence. *State v. Conway*, 109 Ohio St.3d 412,

2006-Ohio-2815, 848 N.E.2d 810, ¶ 62. Absent an abuse of discretion and a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of relevant evidence. *Id*. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Id*.

{¶104} "All relevant evidence is admissible, except as otherwise provided by [federal and state law.]" Evid.R. 402. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Nevertheless, even relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Further, relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

{¶105} Wells argues that the out-of-court identifications should have been suppressed, but alternatively should have been excluded because the probative value of his possible guilt was substantially outweighed by the danger of unfair prejudice in contravention of Evid.R. 401, 402, and 403(A).

{¶106} As we previously discussed under assignment of error two, the court did not err in denying Wells's motion to suppress the photo array identifications of Wiley, Diaz, Morgan, and Allah, and Wells fails to identify how these identifications were

unfairly prejudicial at trial. The jury heard the circumstances surrounding the identifications, including the witnesses' criminal histories, drug use, motivations, and certainty in their identifications. Accordingly, we find no abuse of discretion.

{¶107} Wells next contends that the video prepared by Detective Sandoval was unfairly prejudicial because the video displayed Wells in his jail clothing, and handcuffed. The state used the video to suggest to the jury that Wells had the same walk as the person in the crime video. Wells contends that his gait is not accurately depicted because he is handcuffed. Our review of the video reveals that it is twenty seconds in length and was filmed as Wells was walking away. Although Wells is in jail clothing, it is not readily apparent that he is handcuffed. Nevertheless, we do not find the showing of the video prejudicial.

{¶108} Testimony was given by many witnesses who stated that Wells and the shooter in the surveillance video had the same walk. In fact, Jarrell testified that was how he was able to identify the person on the video. Detective Sandoval's video allowed the jury to view Wells's gait and walk to determine if it was distinctive and comparable to the person on the surveillance video. Wells's walk was an important identifying factor in this case, and the state was permitted to put forth the evidence of this fact. Under the circumstances of this case, the prejudicial effect of Wells being in jail clothing does not outweigh the probative value of allowing the jury to view his walk. Therefore, the trial court did not abuse its discretion in admitting this relevant video into evidence.

{¶109} Wells next contends that the videos and reports prepared by Detective Ciula and the Crimestoppers episode should not have been admitted because it was not the actual video surveillance. Wells contends that the Crimestoppers episode was a sensationalized version of the incident and should have been excluded as being the equivalent of a pretrial publicity news story that deprived him of a fair trial.

{¶110} We first note that the trial court limited the presentation of the episode to the jury to show only the events leading up to the murder, the murder itself, the suspect running away, and Detective Smith giving a synopsis of the crime. Detective Smith reiterated the same information during his testimony before the jury. The trial court ordered that the video be edited or redacted to exclude the interviews with Webb's mother and all the photographs showing Webb. In doing so, the court was very mindful of the prejudicial impact those aspects of the video might have and it lessened the likelihood that the jury would be inflamed by passion.

{¶111} We find the trial court did not abuse its discretion in allowing the redacted Crimestoppers episode to be played before the jury. It allowed the jury to see exactly what the anonymous tipster saw when the tip was made, and it provided context to the jury regarding how the investigation unfolded and how Wells became a suspect.

{¶112} Additionally, Wells argues that showing the Crimestoppers episode to the jury was cumulative and redundant because it incorporated the surveillance video. He contends that Evid.R. 403(B) permits a court to exclude relevant evidence if its probative

value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

{¶113} In this case, showing the redacted Crimestoppers episode was not cumulative; rather it gave the jury context into an investigation that had gone cold, but had resurfaced once a tip came in from the airing of the episode. Accordingly, the trial court did not abuse its discretion in allowing the video to be played. Moreover, even if this court did determine that the playing of the Crimestoppers episode was cumulative and redundant, we cannot say, nor has Wells established, that it was prejudicial.

{¶114} Additionally, Wells contends that Stacey Jarrell's testimony should have been excluded as substantially and unfairly prejudicial because he was permitted to testify that he was a county sheriff. We find nothing improper in allowing a witness to testify about his or her employment because it may be relevant for a jury in judging a person's credibility.

{¶115} Wells also contends that Jarrell should not have been permitted to testify regarding the identification he made from the Crimestoppers episode because his identification was based on hearsay and on characteristics of a person that he had seen once in 25 years. Jarrell testified that Wells is his cousin whom he met in 1992. Although he saw Wells quite frequently during 1992, he did not see him again until 2003 at a funeral, and since the funeral, he had not seen him prior to court. He testified that he had always known Wells to have a "limp." He described the limp as a "hip hop limp" or

"hip hop walk," not a limp from being injured. Jarrell admitted that he had seen others with a similar walk to Wells.

{¶116} Jarrell testified that he was called to the hospital on April 1, 2010, because his brother had been hospitalized with serious injuries. While there, he heard a conversation about the Crimestopper episode and Wells. After he left the hospital and based on the conversation he heard, he went home and watched the Crimestoppers episode about Webb's murder on the internet. Jarrell testified that he did not have an expectation of picking Wells out of the video, but the suspect's walk led him to believe that it was Wells. He testified that he watched the video several times, but knew right away it was Wells — "From that video, I can tell you the person I see on that video is the same as the person in this courtroom." Jarrell identified Wells as the person he saw in the Crimestoppers video.

{¶117} The trial court's decision to allow Jarrell to testify about his employment and identification was not an abuse of discretion. Although the seed may have been planted in Jarrell's head that the suspect in the Crimestoppers video might be Wells, Jarrell testified that he independently viewed the video with no expectation. Moreover, the jury heard Jarrell admit that he had seen other people with the same "limp." Therefore, it is quite possible that the jury, as determiners of credibility, discounted the identification. Even if the court's decision to allow Jarrell to testify regarding the identification was unreasonable, we cannot say that the outcome of the trial would have been different. The testimony of the remaining witnesses, coupled with the surveillance

video, provided overwhelming evidence of guilt. Accordingly, Wells's fourth assignment of error is overruled.

## V. Sufficiency and Manifest Weight of the Evidence

{¶118} In his fifth and sixth assignments of error, Wells argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶119} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶120} Wells was charged with aggravated murder in violation of R.C. 2903.01(A), which provides in relevant part that "no person shall purposely, and with prior calculation and design, cause the death of another."

{¶121} Identity of the shooter was the central issue in this case, and Wells argues that the state failed to prove that he was the shooter beyond a reasonable doubt. We

disagree — the state presented sufficient evidence to prove that Wells was the person who shot and killed Webb.

{¶122} The surveillance video revealed that the shooter was a man wearing a white do-rag, a black t-shirt, blue jeans, and white tennis shoes. Morgan testified that Wells occasionally stayed with him, and that he saw Wells just before the shooting wearing a white wave-cap, a black t-shirt, and jeans. Morgan stated that when Wells left the apartment, he was walking towards West 80th Street and Detroit Road. Morgan stated that he then heard three pops and saw Wells running down Detroit. Morgan identified Wells from the photo array and in court as the person he saw earlier that day as described and who he saw running after he heard the gun shots.

{¶123} Diaz testified that prior to the shooting, she spoke with Wells on the street. After their conversation, he left, walking towards West 80th Street. Diaz stated that Wells was wearing a white do-rag, a black t-shirt, blue pants, and white tennis shoes. Diaz identified Wells in two photo arrays, on the surveillance video, and in court as the person she saw that evening.

{¶124} Wiley also testified that she spoke with Wells the night of the shooting. When she was shown the surveillance video, she was able to identify herself, the victim, and the shooter. She also explained the interactions between the parties — that the shooter got upset with the victim. She then saw the shooter running and shooting the victim. Wiley identified Wells as the person who shot Webb and said she was "100

percent" certain. She was familiar with Wells because she saw him almost every day for two months.

{¶125} Finally, Flores testified that she saw a man with a white do-rag and white tennis shoes pacing around the side of the street. She recalled that he had a funny walk, like a limp. She then heard shots and saw the same man running away as he was putting a long black gun in his pants.

{¶126} The identifications were all relatively consistent: a white do-rag, blue jeans, and white tennis shoes. Additionally, Wiley spoke with Wells just before he shot Webb. The surveillance video corroborates the descriptions given by the witnesses and the actions Wells took. Finally, Wells was not a stranger to Morgan, Diaz, and Wiley — they used to hang out with him on the streets and they identified him in court. Accordingly, viewing the evidence in light most favorable to the prosecution, we find that sufficient evidence was presented supporting Wells's convictions.

{¶127} "'A manifest weight challenge, on the other hand, questions whether the prosecution met its burden of persuasion.'" *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The manifest-weight-of-the-evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d

339, 515 N.E.2d 1009 (9th Dist.1986), paragraph one of the syllabus. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *Thompkins*, 78 Ohio St.3d at 387, 1997-Ohio-52, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶128} Wells argues that his convictions are against the manifest weight of the evidence because the state failed to present any reliable, credible evidence that he was the shooter because (1) the photo array identifications were unduly suggestive, tainted, and unreliable, (2) the witnesses were not credible due to their criminal histories, drug use, or self-serving motivations, and (3) no DNA linked him to the crime.

{¶129} For the reasons stated above in assignments of error two and three, we find that the photo array identifications were not unduly suggestive, tainted, or unreliable. Moreover, the weight to be given to the identifications was for the jury.

{¶130} As for credibility, the jury was able to judge the credibility of the witnesses because they were extensively cross-examined about their criminal histories, drug use, and self-serving motivations. The jury heard Morgan, Wiley, and Diaz admit that they were high on crack cocaine on the day of the murder and had extensive criminal histories. The jury also heard that Shakim Allah came forward to provide information about Webb's murder and Wells's involvement in exchange for leniency on his pending and probation cases. Defense counsel brought any inconsistencies, questionable testimony, and self-serving motivations to the jury's attention. "The jury was free to believe all,

part, or none of the testimony of each witness." *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34.

{¶131} Finally, the fact that Wells's DNA was not found or discovered at the crime scene was not fatal to the state's case because the state was not required to provide DNA or fingerprint evidence linking Wells to the crime. The white do-rag that Morgan gave to detectives was never identified as the do-rag that the shooter wore the night of the murder; rather, it was relayed that it belonged to the shooter for a potential DNA match to discover the identity of the shooter.

{¶132} This is not the exceptional case where jury clearly lost their way and a new trial must be ordered. The jury could not ignore the surveillance video that captured the murder, numerous witnesses describing the shooter and his clothing, and Morgan, Wiley, and Diaz all identifying that Wells was near W. 80th Street and Detroit Road and wearing the exact clothing depicted and described.

{¶133} Moreover, Morgan testified that Wells had a .357 revolver when he left the apartment that day. Both Husein and Johnson testified that they saw the shooter putting a gun in his pants while walking quickly away from the scene after shots were fired. The firearm examiner testified that the bullet recovered from Webb was consistent with a .38 special and .357 Magnum. Accordingly, Wells's convictions were not against the manifest weight of the evidence.

{¶134} His fifth and sixth assignments of error are overruled.

{¶135} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, SR., P.J., and
MARY EILEEN KILBANE, J., CONCUR