[Cite as *State v. Lytle*, 2016-Ohio-3532.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-748 |
| | | (C.P.C. No. 14CR-378) |
| v. | : | No. 15AP-754 |
| | | (C.P.C. No. 14CR-1663) |
| Robert L. Lytle, Jr., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on June 21, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee. **Argued:** *Laura R. Swisher.*

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes.*

---

APPEALS from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Robert L. Lytle, Jr., appeals from judgments of the Franklin County Court of Common Pleas finding him guilty of a total of three counts of robbery under R.C. 2911.02 and imposing consecutive prison sentences on each count. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Several bar robberies on the south side of Columbus committed within a two-day span in January 2014 gave rise to appellant's criminal indictment in two cases. In the first case, related to the Old Landmark Bar, appellant was indicted on January 23, 2014 for four counts of robbery pursuant to R.C. 2811.02. Under Count 1, the indictment alleged appellant, "in attempting or committing a theft offense *in respect to Old Landmark Bar*, or in fleeing immediately after the attempt or offense, did recklessly

inflict, attempt to inflict, or threaten to inflict physical harm on another, to wit: Susan Puckett" on or about January 16, 2014. (Emphasis added.) (Old Landmark Bar Case Indictment at 1.) Count 2 alleged the same conduct, except "in respect to Susan Puckett." (Old Landmark Bar Case Indictment at 1.) Counts 3 and 4, alleging robbery involving the use or threatened immediate use of force against another, were nolled at the request of plaintiff-appellee, State of Ohio.

{¶ 3} In the second case, related to TK Sports Bar, appellant was indicted on April 1, 2014 for four counts of kidnapping, pursuant to R.C. 2905.01, and two counts of robbery, pursuant to R.C. 2811.02. In pertinent part, Count 5 of the indictment alleged appellant, "in attempting or committing a theft offense in respect to TK Sports Bar,[1] or in fleeing immediately after the attempt or offense, did recklessly inflict, attempt to inflict, or threaten to inflict physical harm on another, to wit: Sarah Carter" on or about January 14, 2014. (TK Sports Bar Case Indictment at 2-3.) The remaining counts were nolled at the request of appellee.

{¶ 4} Appellant pled not guilty to the charges, and the cause came to trial on July 20, 2015. At the outset of the trial, the judge overruled appellant's previously filed motion to suppress photo identifications in the TK Sports Bar case due to appellant's allegation of procedure violations under R.C. 2933.83. The judge likewise overruled appellant's motion to sever trial of the separate cases and emphasized he would specifically instruct the jury regarding considering each case separately.

{¶ 5} The trial commenced, and after opening statements, the judge addressed the separate nature of the cases with the jury stating:

> [A]s a matter of law * * * these are separate incidents. You are to consider and analyze each separately. Sometimes we have cases tried apart, but other times we allow them to be together. But we always worry that a jury will say, "Well, he was involved in one, he must be involved in the other." You've got to analyze each on their own facts. They're allowed to make arguments about whether they're similar, but I did caution you that you have to decide each case separately.

(Tr. at 46-47.)

---

[1] The prosecution amended the indictment to reflect Count 5 is in respect to the "TK Sports Bar" rather than "Sarah Carter." (Tr. at 22; TK Sports Bar Case Indictment at 2.)

{¶ 6} The trial resumed, and appellee produced the following relevant evidence in its case-in-chief.

{¶ 7} Stephanie Christman testified that around 10:30 p.m. on Thursday, January 16, 2014, she was at the Old Landmark Bar watching a basketball game with her husband, Steve. According to Stephanie, a man entered the bar through the back door dressed in a grey sweatshirt with the hood up and grey sweatpants and asked the bartender for the location of the restroom. A friend of the Christmans named Bobby Gray was already in the restroom arguing on the phone with his girlfriend, and Stephanie asked her husband to check on him. When her husband returned, the man came out of the restroom wearing a ski mask and holding a gun. Stephanie dropped to the ground behind the bar, while her husband remained seated. Stephanie heard the man say to Susan Puckett, the bartender, "[g]ive me all of the money, or I'm going to kill you, bitch," then ask Puckett for her car keys and what color her car was. (Tr. at 52.) She heard scuffling, and when she got up, she saw three men restraining the man with the ski mask on the ground. Puckett kicked the gun and called 911.

{¶ 8} Stephanie testified that she saw the man's face after police arrived and removed the ski mask. She identified appellant in the courtroom as the man who entered the restroom, exited the restroom in a ski mask, and was arrested by police that evening. Stephanie recalled that the lighting in the back of the bar was "a little dim" but testified that she did not have problems seeing the man or the gun, which had a laser light. (Tr. at 53.) Stephanie later learned from police that the gun was a fake. Stephanie agreed she had consumed alcohol that evening, specifically Bud Light, and did not remember how many she consumed but said she did not feel inebriated and noted she had to work the next day. On cross-examination, Stephanie agreed she could have had up to eight Bud Lights over the course of the three hours she was at the bar watching the game. Stephanie additionally agreed that in the written statement she made to police after the incident, she did not indicate that the man wore a ski mask or that he took Puckett's car keys.

{¶ 9} Stephanie's husband, Steve Christman, testified that he watched a basketball game at the Old Landmark Bar on the evening of January 16, 2014 with his wife, Gray, a person named Doug Purcell, a few other people, and bartender Susie Puckett. At his wife's prompting, Steve checked on Bobby in the bathroom, and observed

someone else at the urinal with his hood up. He returned and reported everything was okay, but then saw the man come out of the bathroom with a ski mask on and point the laser of a gun at Puckett's chest while she was at the cash register. According to Steve, who said he remained sitting at his bar chair, Puckett gave the man with the ski mask the money from the cash register after the man threatened to kill her. Steve then heard the man in the mask ask Puckett for her car keys and saw Puckett remove a key from her key ring and give him the key. Right before the man exited the back door, Purcell hit the man with a pool stick, possibly dislodging the gun, and Steve and Purcell took the man to the floor, where they held him until police arrived.

{¶ 10} Although Steve indicated that the lighting in the bar was dim, he did not have trouble seeing individuals in the bar. Steve further testified that he was able to view the face of the man when police stood him up and removed his ski mask and identified appellant in the courtroom as that man. Steve agreed he had consumed alcohol that evening but testified that his alcohol consumption did not affect what he saw or heard that night.

{¶ 11} On cross-examination, Steve agreed that he did not know if anyone else was in the restroom along with his friend Bobby and the man with his hood up but said the restroom only had room for two people. He also confirmed that in his written statement to police he did not write that the man in the ski mask threatened to kill Puckett.

{¶ 12} Doug Purcell testified to being at the Old Landmark Bar on the evening of February 16, 2014. While he was at the bar, he saw a red dot on Puckett's back and observed a man with a gun wearing a "hoodie" and a mask. (Tr. at 125.) According to Purcell, the man said "[f]ucking bitch, give me the money" and "[g]ive me your money, or I'll kill you," and then asked for Puckett's car keys and where her car was located. (Tr. at 122.) Puckett and the man walked toward the back door of the bar, and Purcell thought that Puckett was going to go outside with him. Purcell hit the man in the back with a pool stick and threw him to the ground. Steve assisted him in getting the man to the ground, and someone got the gun and kicked it on the floor. Purcell thought the man probably was punched and kicked in the process. During the confrontation, Purcell recalled hearing something like a radio or police scanner coming from the man.

{¶ 13} Purcell thought that he had two or three alcoholic drinks that night, which he believed did not affect his judgment.  Purcell testified that he was able to view the man's face without the mask on and identified appellant in the courtroom as that man.

{¶ 14} On cross-examination, Purcell agreed that he had not included in his written statement to police that the man wore a ski mask, that the man said the threatening words he just testified to hearing, or that Purcell hit the man with a pool stick. When questioned about his identification of appellant as the assailant, Purcell testified that he did not get a good look at the man in the mask, reiterated that he did see his face, and thought appellant did not look exactly the same as he did on January 16, 2014. Purcell also agreed that he had spoken to the Christmans, Gray, and the bartender about the situation since the incident happened.

{¶ 15} Susan Puckett testified to being present and interacting with the purported robber during the incident at the Old Landmark Bar on January 16, 2014.  Puckett testified that she was familiar with the Old Landmark Bar because she "work[s] there." (Tr. at 150.)  Specifically, Puckett testified that her position at the bar was "bartender" in January 2014, but at the time of trial she was "a manager there."  (Tr. at 150.)  At the time of the incident, Puckett testified that she was working in the capacity of a bartender. While she was bartending, someone wearing a hoodie walked in the back door and asked where the bathroom was located.  After about five minutes, Puckett testified that:

> I guess I turned around, and he was there with a ski mask on his face and a gun, demanding that I give him all the money in the register and telling me that he would kill me if I didn't comply.  He stated to give him all of the money and not to bullshit him or he would kill me.
>
> I gave him all the money.  He kept saying "all of it."  And then he asked for my keys, asked me if I had a car, and wanted my keys.  So I gave  him -- I went and got my key ring and I took the keys off of -- I took my car key off my key ring and handed it to him.
>
> He asked me where my car was at.  I started to go out of the building.

(Tr. at 152.)

{¶ 16} At that point, customers tackled the man, and Puckett called 911 and slid the dislodged gun away from him with her foot.  After police arrived, Puckett asked to see the man's face to see if she recognized him, which she did not.  In court, Puckett identified appellant as the man who held up the bar.  Eventually, all the money taken was returned, and Puckett got back her car keys.

{¶ 17} On cross-examination, Puckett testified that she and the others try not to talk about the incident with each other.  Regarding other disturbances at the bar, Puckett indicated that "in the four years that [she has] been there," only about two other bar fights had occurred.  (Tr. at 171.)  She agreed that in her written statement she did not include expletive words used by the assailant when demanding the money or that he wore a mask.  She thought she told the detective about the mask and noted that the man still had the mask on when police arrived.

{¶ 18} Randall Beam, an officer with the Columbus Division of Police, testified to responding to a robbery-in-progress dispatch on January 16, 2014 at the Old Landmark Bar.  When he arrived, another officer had the suspect detained on the ground and was placing handcuffs on him.  Beam recovered cash from the suspect and a nearby gun on the ground.  Beam testified that police additionally recovered a cell phone from the suspect running what appeared to be a police scanner "app" in which the dispatch runs of the city police could be heard.  (Tr. at 185.)  Concerning the behavior of the bar patrons, Beam did not observe indications that they were drunk or needed to be checked for sobriety.

{¶ 19} Craig Goodman, a patrol officer with the Columbus Division of Police, likewise testified to responding to a robbery dispatch on January 16, 2014 at the Old Landmark Bar.  Goodman entered the bar, observed that patrons had subdued the suspected robber, and secured the suspect in handcuffs.  Thereafter, Goodman spoke to the patrons regarding the incident, then took the suspect to the police car and secured property on his person.  The property recovered included, among other items, a pair of gloves, a ski mask, a pocketknife, a cellphone and ear phones, a BB gun with a fake silencer, and cash.  Goodman identified appellant in court as the person he placed in handcuffs that evening.  On cross-examination, Goodman agreed that on the day of the incident the weather was cold with snow on the ground, that it was not uncommon for people to have things like gloves and hats during such weather, and that when he arrived

it appeared that the suspect had taken "a pretty good beating," enough so for Goodman to call medics. (Tr. at 202.)

{¶ 20} Todd Cress, a detective with the Columbus Division of Police robbery unit, testified to investigating a robbery at the Old Landmark Bar that allegedly occurred on January 16, 2014. As part of his investigation, Cress interviewed the bar patrons, the other two officers, and the suspect. In court, Cress identified appellant as the suspect that he interviewed.

{¶ 21} During Cress's interview with appellant, after being read his rights and agreeing to speak with the detective about this incident, appellant claimed that he entered the bar, used the restroom, and then sat down and ordered a beer. According to appellant, he only had $12 in his pocket, and, in need of more money, he attempted to sell the fake gun to the bar patrons for $20. Instead, out of nowhere, one of the patrons who thought he knew appellant by the name of "Buddy" began beating him and other patrons joined. (Tr. at 221.) According to appellant, the bar patrons said "Call the cops. We'll say he robbed the bar since he's got the gun," and everyone agreed since they were all friends, and since the original patron at the source of the fight had convinced the group that appellant gave his sister gonorrhea. (Tr. at 222.) Appellant additionally explained that the ski mask was a black toboggan for the cold weather and that he had the police scanner to listen for robberies occurring in an area where he had recently been robbed. During the interview, appellant denied that police secured money from him and maintained his innocence when Cress feigned having viewed a videotape of the incident.

{¶ 22} Sarah Carter testified that she worked as a bartender at the TK Sports Bar on the evening of Tuesday, January 14, 2014, two days prior to the Old Landmark Bar incident. According to Carter, that night:

> [A] gentleman walked in the door * * *. He started going towards the restroom. I stopped him about halfway to the restroom.
>
> I said, "We don't have public restrooms." He barely looked up at me and said, "I'm going to be getting a drink." Then he proceeded in the restroom.
> A couple minutes passed. He came back out, had a mask over his face, came to the middle of the bar and held a gun on me. It had one of those little red dots. That's what I focused on. It

> was right on my chest. He asked for me to give him all the money out of the register, and if I didn't, he was going to kill me.
>
> * * *
>
> I panicked. I jumped. I was scared. I've never had anyone point a gun at me. I immediately turned around, got him all the money out of the register, handed it to him across the bar, and he proceeded out of the bar.

(Tr. at 249-50.) Carter testified that the words used by the man were "[g]ive me the money out of the register" and then "[i]f you don't do this, I'm going to kill you." (Tr. at 251.) Carter testified that she was able to look at the man without a mask when he first came into the bar and described his clothes as really baggy, like sweatpants, and perhaps a sweatshirt or jacket. The mask worn by the man was black with the eyes cut out, and the gun he carried was black with a laser pointer.

{¶ 23} After the man left, Carter pressed a silent alarm button underneath the bar and also used the phone to call police. Police were unable to apprehend the person who robbed her that evening, but she was later approached by detectives about a possible suspect. The detectives asked her to view a line up of six photographs, and Carter picked photograph four, the photograph of appellant, and indicated she was 60 percent sure that the photo selected was the person who robbed her. Regarding her percentage, Carter explained that she had very little chance to view the individual because he hardly made eye contact with her, and she did not want to pick the wrong person, but that the more she looked at the photo array she was "almost positive" that it was the person she chose. (Tr. at 267.) In the courtroom, Carter, without hesitation, identified appellant as the person who robbed her and stated that she was now "not worried at all" that appellant is the wrong person. (Tr. at 275.)

{¶ 24} On cross-examination, Carter agreed that the description she gave police after the incident indicated that the suspect was in his late twenties to early thirties with light brown to blond hair. Carter additionally agreed that in the notes of her photo array selection, she indicated that her 60 percent determination was in part due to her being

unable to see the remainder of his body in the photo because she thought the suspect was a heavier-set man.

{¶ 25} During the conversation about the photo array, appellant's counsel asked Carter whether the second and fifth photograph appeared to be the same person. Carter replied, "[t]hey look similar * * *. They do look similar. I wouldn't tell you today they are the same person." (Tr. at 276-77.) When pressed about why she did not realize that two of the photographs were actually the same person, Carter replied, "[b]ecause I knew they were not the people that robbed me. I guess I didn't focus on that very much." (Tr. at 277.) Carter agreed that she and the other bar patrons involved talked about the incident between the day the alleged robbery occurred and the day she viewed the photo array.

{¶ 26} Anjanette Meade, a bartender at TK Sports Bar, testified that around 10:30 p.m. on January 14, 2014, she and her boyfriend were sitting at the corner of the bar. According to Meade, a man entered the bar wearing big sweats and went into the restroom after telling Carter he would buy a drink. As Meade talked to her boyfriend, a red light appeared on his forehead and face. Meade turned and looked down the bar and saw a man with gloves, a mask, and a gun. Meade thought they were being robbed and restrained her boyfriend as the man later passed them to exit the bar.

{¶ 27} Meade testified that she was able to see the man's face without the mask as he passed her on the way to the restroom, in lighting that was probably dim. She said she had about two drinks that evening that did not affect her judgment. A few days later, on January 20, police asked Meade to see if a photo array included the suspected robber. Meade testified that she picked photo number four "[r]ight away" and was about 90 percent sure the man in that photo was the person who robbed the bar. (Tr. at 304.) In court, Meade testified that she remained confident in her choice and identified appellant as the person she believed robbed TK Sports Bar.

{¶ 28} On cross-examination, before being informed by appellant that photos two and five in the array were actually the same person, Meade expressed her belief that the photos were "[a]bsolutely" different people. (Tr. at 322.) Meade additionally confirmed that she and Carter had been friends for about six years.

{¶ 29} Misty Temple testified that on the night of the incident she was playing a game of pool at TK Sports Bar near the front entrance of the bar. According to Temple, a

man walked into the bar wearing a toboggan rolled up on his face, a sweatshirt, and jeans. She heard Carter tell the man that he had to get a beer and then saw the man enter the restroom. When Temple next looked up, she saw the man pointing a black gun with a red laser in Carter's face, asking for money, and then saw him take the money and exit through the front door with the gun still in his hand.

{¶ 30} Temple testified to looking at the man's face when he walked into the bar proximate to the "pretty well lit" pool table area and observing him first speak to Carter. (Tr. at 344.) Police asked her to view a photo array on January 26, 2014, and Temple selected, with 90 percent certainty, photo number four as the person who robbed the bar. She then changed her percentage to indicate she was 99 percent sure. In the courtroom, Temple testified that she remained 99 percent sure about the choice she made and identified appellant as "[n]o question" the person who robbed the bar. (Tr. at 360.)

{¶ 31} On cross-examination, Temple agreed that in between the incident and January 26, she spoke with Carter and Meade, and someone contacted her to let her know a detective was looking for her to conduct the photo array identification. When prompted to look again at photos two and five of the array and asked by appellant's counsel "They're the same person, aren't they," Temple replied "[m]aybe." (Tr. at 354.) She agreed that at the time she identified the fourth photo as the robber of TK Sports Bar, she did not know photos two and five were the same person and explained "I wasn't looking for the same person" but rather "the person that I saw walking into TK's." (Tr. at 355.)

{¶ 32} Gary Bowman, a robbery detective for the Columbus Division of Police, testified to responding with his partner, Kenneth Kirby, to a robbery at the TK Sports Bar on the night of January 14, 2014. Bowman and Kirby interviewed Carter, Meade, and a few other people that evening but did not apprehend a suspect. Days later, Cress contacted him regarding potential commonalities between the two incidents.

{¶ 33} With information gathered from Cress on the suspect in the Old Landmark Bar case, Bowman compiled the photo array. According to Bowman, to create a photo array, an officer inputs into the computer the age, weight, height, facial hair qualities, and hairstyle of the suspect, and then the computer pulls up all the pictures that are supposed to be similar to those search parameters. The officer then chooses five pictures out of those supplied. Bowman testified that he was unware at the time he compiled the array

that two of the photos selected were the same individual and said that he "didn't catch it" or review the names associated with the photos provided on a second sheet.  (Tr. at 374.) Bowman confirmed that numbers two and five of the array were photographs of the same individual taken at different time periods and stated that the photos had "different faces" and "look[ed] like two different guys."  (Tr. at 374.)  Bowman provided the array to Kirby, who administered the photo array with the witnesses.

{¶ 34} On cross-examination, Bowman agreed that Meade's boyfriend, who was sitting with her at the bar, could not give a description of the suspect.  According to Bowman, four people present at the bar that night could give a description of the robbery suspect and were subsequently shown the photo arrays.  Out of those four, one person could not select a photo from the array as the suspected robber.  Furthermore, Bowman agreed that there "[n]ever" should be a photo array with two of the same individuals and that, in Bowman's opinion, to do so was improper and a violation of the statute that governs photo arrays.  (Tr. at 391.)  Bowman disagreed in this instance that the photo array was unfair to appellant because that same person looked "so dramatically different" (Tr. at 391) in the two photographs, which were over a "big time frame" (Tr. at 393), so as to in essence be "two different faces" (Tr. at 391).

{¶ 35} Kenneth Kirby, a police officer with the Columbus Division of Police robbery unit, testified to responding to a robbery at the TK Sports Bar, interviewing witnesses there, reviewing the surveillance video, and photographing the scene.  According to Kirby, sometime later Bowman identified a suspect and asked Kirby to approach certain witnesses with photo arrays.  Kirby did not know the name of the suspect, had not viewed a photograph of the suspect, and did not recall receiving a general email about the suspect broadcast by other detectives.  Kirby testified that Carter selected appellant and stated she was 60 percent sure of her choice, Meade selected appellant right away and stated she was about 90 percent sure of her choice, and Temple selected appellant and stated she was 90 percent sure, which she then changed to 99 percent sure, of her choice.

{¶ 36} On cross-examination, Kirby agreed that Temple told him during his initial interview that the suspect had a mustache and a slight goatee, that two other witnesses could not give a facial description of the suspect during the initial interviews, and that another witness shown the photo array could not pick anyone as the suspect.  Kirby also

confirmed that he presented the same photo array, with appellant in the fourth photograph position, to each witness on different days and that it is generally possible for witnesses to speak to each other about the arrays.

{¶ 37} Both parties rested. Appellant objected to the admission of the photo array identification sheets due to the inclusion of the same person twice. The remainder of appellee's exhibits were admitted without objection, including appellant's taped interview with police, the surveillance video, witness statements, and photographs. The judge then read jury instructions, including a general credibility instruction and the statement, "[r]emember, you must analyze each incident independently from one another. Your decision, analysis and verdict on one case may not affect your analysis, decision and verdict on the other case. The law does allow you to consider modus operandi not as it relates to whether he's a bad person, for two incidents, but that the incidents were similar." (Tr. at 504.) Later, the judge again stated, "Just to make sure there's no confusion, you know there are three counts, right? Two counts as it relates to the bars and one count as it relates to the bartender and the key. All three of those cases have to be decided separately." (Tr. at 515.)

{¶ 38} The jury found appellant guilty of all three counts of second-degree robbery under R.C. 2911.02. A sentencing hearing was held on July 22, 2015, after which the judge imposed three years of incarceration for each count of the Old Landmark Bar case to be served consecutively to each other for a total of six years and three years of incarceration on the TK Sports Bar case to be served consecutively to the Old Landmark Bar case for a total of nine years incarceration. Appellant filed a timely appeal to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 39} Appellant assigns the following assignments as error:

> 1. The State proved that [appellant] committed only one "robbery" at Old Landmark Bar; the conviction on a second count of robbery is neither supported by sufficient evidence nor consistent with the manifest weight of the evidence.
>
> 2. In the Old Landmark Bar case, the trial court refused to merge the two counts of robbery into a single conviction under R.C. 2941.25(A).

3. The trial court overruled Appellant's motion to sever the trial.

4. In the TK Sports Bar case, the trial court failed to instruct the jury as required by R.C. 2933.83(C)(3).

## III. DISCUSSION

### A. First Assignment of Error

{¶ 40} In his first assignment of error, appellant contends his conviction for two robberies at the Old Landmark Bar is supported by insufficient evidence and is against the manifest weight of evidence. Specifically, appellant argues the two robbery charges, one related to the bar and one related to the bartender, are "redundant," and the evidence only proves one robbery occurred. (Appellant's Brief at 6.) For the following reasons, we disagree.

{¶ 41} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 42} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified

truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 43} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 44} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770. 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 45} In order to find appellant guilty of the two applicable counts of robbery under R.C. 2911.02 for the Old Landmark Bar case, for each count appellee had to prove beyond a reasonable doubt that appellant, "in attempting or committing a theft offense or in fleeing immediately after the attempt or offense" did "[i]nflict, attempt to inflict, or threaten to inflict physical harm on another." R.C. 2911.02(A)(2). The applicable theft offense underlying the charge here states "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or

services * * * [w]ithout the consent of the owner or person authorized to give consent; [or] [b]y threat." R.C. 2913.02(A)(1) and (4); *see also* R.C. 2911.02(C)(2) and 2913.01(K).

{¶ 46} Appellant argues that he took two sets of items, the cash and the keys, from only one person, Puckett, and likewise threatened her alone. Appellant "is not suggesting that to win a theft or robbery conviction the State must prove the identity of the owner [of property taken]." (Appellant's Brief at 12.) Nonetheless, appellant calls into question whether evidence proved the bartender owned the car keys, whether the bar owned the cash register money, and contends appellee failed to prove beyond a reasonable doubt that cash and keys taken had different owners. For example, appellant suggests that Puckett could have been the owner of the bar or that her possession and control of the cash made her the "owner" for purposes of a robbery. (Appellant's Brief at 13.) As such, appellant cites to *State v. Skapik*, 2d Dist. No. 2015-CA-5, 2015-Ohio-4404, ¶ 12-15, for the proposition that stealing multiple items from one person equate to a single theft.

{¶ 47} In *Skapik*, in pertinent part, the defendant stole two firearms, a bulletproof vest, ammunition, and other related items from an off-duty deputy sheriff's vehicle. The trial court convicted and sentenced the defendant separately on two counts of grand theft for stealing the two firearms and on one count of misdemeanor theft for stealing the bulletproof vest and other items from the deputy sheriff's vehicle. The Second District Court of Appeals reversed, reasoning that "stealing multiple items from one victim at one time in one location" does not "involve[] the commission of 'separate acts' that may be punished separately." *Id.* at ¶ 15. In doing so, the court noted that the case did not involve an act of theft against multiple victims.

{¶ 48} By its own terms, the reasoning of *Skapik* is not applicable where a defendant steals multiple items from multiple victims. Generally, a defendant who steals money from the cash register of a business, as well as personal items from those individuals working at the business, commits separate crimes with separate victims. *State v. Payne*, 10th Dist. No. 02AP-723, 2003-Ohio-4891, ¶ 82, *discretionary appeal not allowed*, 107 Ohio St.3d 1411, 2005-Ohio-5859 (finding that defendant was properly convicted and sentenced on separate counts of aggravated robbery where defendant stole money from the safety box of a flower shop and personal items from the store manager and a worker); *State v. Byrd*, 32 Ohio St.3d 79, 85 (1987) (finding that stealing money

from the cash register of a convenience store and personal items from the store clerk "were separate crimes independent of each other").

{¶ 49} Here, during Puckett's testimony at trial, she identified herself as a bartender and then a manager at the Old Landmark Bar who had worked there for approximately four years. She and several other witnesses described appellant taking the money she removed from the cash register of the bar and subsequently taking Puckett's own car key. Viewing the evidence of the record in a light most favorable to the prosecution, we find the evidence sufficient to support a conviction on both the robbery charge in respect to the Old Landmark Bar and the robbery charge in respect to Puckett.

{¶ 50} Furthermore, our review of the entire record, after weighing the evidence and all reasonable inferences and considering the credibility of witnesses, shows that the trier of fact did not clearly lose its way and create a manifest miscarriage of justice in respect to the two convictions. From this record, a rational trier of fact could have reasonably inferred that Old Landmark Bar and Puckett separately owned the car key and at least a portion of the money in the cash register. Therefore, the conviction on a second count of robbery is not against the manifest weight of evidence.

{¶ 51} Accordingly, appellant's first assignment of error is overruled.

### B. Second Assignment of Error

{¶ 52} In his second assignment of error, appellant contends that the trial court erred when it did not merge his two Old Landmark Bar robbery convictions under R.C. 2941.25(A). For the following reasons, we disagree.

{¶ 53} Ohio law generally prohibits a defendant from being convicted of more than one "allied offense[] of similar import." R.C. 2941.25(A). "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. More specifically, "a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus. "Two or more offenses of dissimilar import exist within

the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus. An appellate court reviews the trial court's R.C. 2941.25 determination de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699.

{¶ 54} Regarding whether the conduct constitutes offenses of dissimilar import, as previously resolved in the first assignment of error, appellee proved beyond a reasonable doubt appellant robbed both the Old Landmark Bar and the bartender. Therefore, this is a case involving two separate victims.

{¶ 55} Appellant attempts to carve a caveat to *Ruff*'s "separate victim" rule for property crimes. *Id.* at paragraph two of the syllabus. Specifically, appellant argues that courts have "refused to ascribe separate 'import' " to property crimes involving items stolen from different owners. (Appellant's Brief at 20.) In support of this argument, appellant cites to *State v. Coffman*, 16 Ohio App.3d 200 (10th Dist.1984), paragraph two of the syllabus (holding that thefts merge under R.C. 2941.25(A) where defendant "in one act steals money from two purses, each belonging to a different person but left in the same automobile"); *State v. Walker*, 10th Dist. No. 86AP-816 (July 16, 1987) (holding, under *Coffman*'s analysis of R.C. 2941.25, that two aggravated robbery offenses merge where the defendant took two coats from a coatroom belonging to different people); *State v. Whorton*, 2d Dist. No. 10715 (Oct. 20, 1988), *aff'd on other grounds*, 51 Ohio St.3d 121 (1990) (following *Coffman*'s analysis of R.C. 2941.25 to hold that two aggravated robberies merge where defendant took cash from a motel and the owner of the motel); *State v. Harvey*, 8th Dist. No. 71774 (Oct. 30, 1997) (holding, with citation to *Coffman*'s analysis of R.C. 2941.25, that an aggravated robbery offense and theft offense merge where the defendant demanded a manager give him money from a store cash register and did not take personal items from the manager).

{¶ 56} Appellant acknowledges the possibility that "*Ruff* effectively overrules the 'similar import' analysis in all of these cases by creating a categorical rule that applies across the criminal spectrum." (Appellant's Brief at 23.) However, appellant argues that the "better interpretation of *Ruff*'s 'separate victim equals dissimilar import' language is either (1) that in appropriate circumstances, a separate victim can give rise to a separate

offense of dissimilar import, or (2) that *Ruff*'s categorical rule (if it be such) is a rule that applies only with respect to victims who are humans exposed to risk of physical harm." (Appellant's Brief at 23.)

{¶ 57} In analyzing the meaning of dissimilar import under R.C. 2941.25(B), *Ruff* reasons "[w]hen a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts." *Id.* at ¶ 26. The cases *Ruff* cites as the basis for this conclusion are *State v. Jones*, 18 Ohio St.3d 116 (1985), and *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304. We note that *Coffman*, which also underpins the remainder of appellant's cited cases, was not only decided over 30 years prior to *Ruff*, but was also decided prior to the cases at the heart of *Ruff*'s rule. *See id.* at ¶ 23; *Jones*; *Franklin*.

{¶ 58} Appellant cites to no cases which explicitly except *Ruff*'s reasoning in the context of property crimes. Our research likewise has not revealed such an exception and instead shows the separate victim reasoning in *Ruff* remains applicable in various cases involving property crimes. *See, e.g., State v. Calvin*, 8th Dist. No. 100296, 2016-Ohio-805, applying *Ruff* (holding that because defendant's plea agreement involved identity fraud and theft counts that involved separate victims, they do not constitute allied offenses and therefore do not merge); *State v. Peterson*, 9th Dist. No. 27890, 2016-Ohio-1334, ¶ 9-11, applying *Ruff* (holding that defendant's conduct supported multiple robbery convictions and did not merge under R.C. 2941.25 where four separate victims were involved).

{¶ 59} Furthermore, even prior to *Ruff*, this court in *Payne* rejected merger of robbery offenses in circumstances similar to this case. *Id.* at ¶ 82-83. In *Payne*, in pertinent part, the defendant argued that two of his two robbery convictions, which arose from his theft of personal items from a store manager and a worker, should have merged with his robbery conviction arising from his theft of cash and items from the business safety box. This court disagreed, reasoning that "each offense committed by [the] defendant was perpetrated against a different victim and each victim was forced to relinquish their property to [the] defendant." *Id.* at ¶ 83. As such, we found that the appellant conducted each robbery with a different animus and therefore the offenses did not merge under R.C. 2941.25(B).

{¶ 60} Here, appellant's conduct victimized the business by first taking money from the cash register and then separately victimized the bartender by taking her car keys. Considering all the above, we find that *Ruff*'s reasoning controls over the cases cited by appellant, and appellant's conduct constitutes offenses of dissimilar import within the meaning of R.C. 2941.25(B). Furthermore, both *Payne* and record evidence showing that appellant attempted to abscond in the bartender's car support the additional conclusion that appellant committed the offenses with separate animus. Therefore, under R.C. 2941.25(B), appellant's convictions do not merge.

{¶ 61} Accordingly, appellant's second assignment of error is overruled.

## C. Third Assignment of Error

{¶ 62} In his third assignment of error, appellant contends the trial court erred in denying his motion to sever the trial of the two cases. For the following reasons, we disagree.

{¶ 63} Ohio's criminal rules permit a court to order two or more indictments to be tried together "if the offenses * * * could have been joined in a single indictment." Crim.R. 13. Crim.R. 8(A) states that two or more offenses may be charged in the same indictment if they are of "the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." *State v. Sullivan*, 10th Dist. No. 10AP-997, 2011-Ohio-6384, ¶ 21. Joinder of multiple offenses in a single trial is generally favored because it " 'conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries.' " *Id.*, quoting *State v. Walters*, 10th Dist. No. 06AP-693, 2007-Ohio-5554, ¶ 21.

{¶ 64} Nonetheless, an accused may move to sever counts of an indictment on the grounds that he or she will be prejudiced by the joinder of multiple offenses. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 49. To succeed on a motion to sever, a defendant " 'must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.' " *State v.*

*Lott*, 51 Ohio St.3d 160, 163 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus.

{¶ 65} The state can negate a defendant's claim of prejudicial joinder in two ways. *LaMar* at ¶ 50.  First, if the state shows that evidence of one offense would be admissible at a separate trial of the other offense as "other acts" evidence under Evid.R. 404(B), then joinder of the offenses in the same trial cannot prejudice the defendant.  *State v. Tipton*, 10th Dist. No. 04AP-1314, 2006-Ohio-2066, ¶ 27, citing *LaMar* at ¶ 50; *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 30; *State v. Coley*, 93 Ohio St.3d 253, 259 (2001). Second, a joinder cannot result in prejudice if the evidence of the offenses joined at trial is simple and direct, so that a jury is capable of segregating the proof required for each offense.  *Tipton* at ¶ 27, citing *State v. Johnson*, 88 Ohio St.3d 95, 109 (2000); *State v. Mills*, 62 Ohio St.3d 357, 362 (1992).  These two tests are disjunctive so that the satisfaction of one negates a defendant's claim of prejudice without having to consider the other test.  *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, ¶ 38 (10th Dist.), citing *State v. Cameron*, 10th Dist. No. 09AP-56, 2009-Ohio-6479, ¶ 35, citing *Mills* at 362.

{¶ 66} Generally, an appellate court will not reverse a trial court's decision to deny severance unless the trial court has abused its discretion.  *Lott* at 163.  An abuse of discretion means that a trial court's ruling was unreasonable, arbitrary, or unconscionable.  *State v. Vasquez*, 10th Dist. No. 05AP-705, 2006-Ohio-4074, ¶ 6.  However, here, appellant did not move the trial court to sever the indictments either at the close of appellee's case-in-chief and the close of all evidence.  As such, as acknowledged by appellant in his reply brief, he has waived all but plain error review on appeal.  *State v. Corker*, 10th Dist. No. 13AP-264, 2013-Ohio-5446, ¶ 12-13.  " 'Plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper [joinder].' "  *Id.* at ¶ 12, quoting *State v. McGee*, 8th Dist. No. 92019, 2010-Ohio-2081, ¶ 24, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996).

{¶ 67} Appellant concedes that the evidence is simple and direct and that no violation of Evid.R. 404(B) or Crim.R. 14 occurred.  Instead, appellant argues that "[a]llowing a jury hearing the TK Sports Bar case, in which the only contested issue was

identity, to hear evidence of [appellant's] guilt in the Old Landmark Bar case violated Evid.R. 403(A), because the evidence was more prejudicial than probative" and curing the prejudice was "impossible."  (Appellant's Brief at 36.)  Appellant made neither argument to the trial court.  It is well-settled that a party may not raise an issue on appeal that was not initially raised before the trial court.  *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 15.

{¶ 68} Furthermore, we note that, even if appellant's Evid.R. 403(A) argument could be inferred from his arguments to the trial court, the argument under Evid.R. 403(A) is only relevant to challenge appellee's assertion regarding the hypothetical admissibility of the evidence.  The Evid.R. 403(A) argument does not negate the "simple and direct" evidence of the offenses, which is a separate means to negate a defendant's claim of prejudice from joinder.  *LaMar* at ¶ 50; *Lott* at 163.  As previously stated, appellant concedes the evidence is simple and direct, and, as such, "a joinder cannot result in prejudice."  *Tipton* at ¶ 27.

{¶ 69} Considering all the above, we cannot say that it was an abuse of the trial court's discretion, let alone plain error, for the court to allow the indictments to remain joined throughout the trial.

{¶ 70} Accordingly, appellant's third assignment of error is overruled.

**D.  Fourth Assignment of Error**

{¶ 71} In his fourth assignment of error, appellant contends that "the trial court violated R.C. 2933.83(C)(3) in the TK Sports Bar case by failing to instruct the jury that the jury may consider evidence of noncompliance with mandatory photo-lineup procedures in determining the reliability of the witnesses' purported identification of [a]ppellant."  (Appellant's Brief at vii.)

{¶ 72} As a preliminary issue, appellant argues that even though he did not request a jury instruction, pursuant to R.C. 2933.83(C)(3), or specifically object to the lack of this jury instruction, he preserved de novo review of this issue by objecting to the submission of the photo array generally.  We disagree.  Generally, the time to call an error to the court's attention is " ' "at a time when such error could have been avoided or corrected by the trial court." ' "  *Quarterman* at ¶ 15, quoting *State v. Awan*, 22 Ohio St.3d 120, 122 (1986), quoting *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus.

Hence, the failure to object to the lack of a jury instruction under R.C. 2933.83(C)(3) constitutes a waiver of all but plain error on appeal under Crim.R. 52(B). *State v. Wells*, 8th Dist. No. 98388, 2013-Ohio-3722, ¶ 97, citing *State v. Williams*, 51 Ohio St.2d 112 (1977); *State v. Thompson*, 4th Dist. No. 12CA688, 2013-Ohio-2235, ¶ 23.

{¶ 73} The record demonstrates that defense counsel did not object to the instructions the jury received in this case. Accordingly, we address this assignment of error under the plain error standard. "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." *State v. Obermiller*, ___ Ohio St.3d ___, 2016-Ohio-1594, ¶ 62, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002) (stating that an error affects substantial rights under Crim.R. 52(B) only if it affects the outcome of the trial). *See also State v. Arnold*, ___ Ohio St.3d ___, 2016-Ohio-1595, ¶ 65, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus (holding that an error does not rise to plain error unless "but for the error, the outcome of the trial clearly would have been otherwise"). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at 97.

{¶ 74} R.C. 2933.83 "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt minimum procedures for conducting the lineups." *Thompson* at ¶ 22; R.C. 2933.83(B). For example, these minimum procedures include, unless impracticable, use of a "blind or blinded administrator" and having the administrator make a written record of the identification. *Id.* The statute "do[es] not prohibit a law enforcement agency or criminal justice entity from adopting other scientifically accepted procedures for conducting * * * photo lineups that the scientific community considers more effective." R.C. 2933.83(D). Furthermore, R.C. 2933.83(A)(8) defines a "[p]hoto lineup" as "an identification procedure in which an array of photographs, including a photograph of the suspected perpetrator of an offense and additional photographs of other persons not suspected of the offense, is displayed to an eyewitness for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator of the offense."

{¶ 75} The "penalt[ies]" for failing to comply with R.C. 2933.83 is a potential jury instruction under R.C. 2933.83(C)(3), and, if the procedure was "impermissibly

suggestive," potential suppression of the identification.  *Wells* at ¶ 84, 98.  R.C. 2933.83(C)(3) states:

> When evidence of a failure to comply with any of the provisions of this section, or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section, is presented at trial, the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup.

{¶ 76} Appellant contends that evidence of a failure to comply with the provisions of R.C. 2933.83 was presented at trial in order to trigger a jury instruction.  Specifically, appellant points to Bowman's and Kirby's testimonies as evidence that including two photographs of the same person violated the Columbus police lineup procedure.  It is true that Bowman expressed his own opinion that including two photographs of the same person was a statutory violation.  However, the minimum statutory requirements and definition of photo array in R.C. 2933.83 do not address whether five distinct people must be included in the array alongside the defendant.  In addition, testimony reflecting the officers' belief that the duplication never should have occurred falls short of establishing a procedure against photo duplication "adopted" by the Columbus police department under R.C. 2933.83.  R.C. 2933.83(C).

{¶ 77} In other words, whether or not a violation of R.C. 2933.83 occurred is not obvious from record evidence.  As such, we cannot say any possible defect in not including a jury instruction, pursuant to R.C. 2933.83(C)(3), rises to the level of "plain" error within the meaning of Crim.R. 52(B).  *Barnes* at 28.  *See also Thompson* at ¶ 24 (finding, in the context of a court's failure to impose a jury instruction under R.C. 2933.83(C)(3), no plain error occurs where insufficient record evidence demonstrates noncompliance with the statute).

{¶ 78} We likewise cannot say that any possible error in not including the R.C. 2933.83(C)(3) jury instruction affected the outcome of the trial.  The jury heard extensive testimony and cross-examination regarding the photo array identifications and the two

photographs of the same person. The witnesses testified that they did not know that two photographs of the same person were placed in the photo array and that it did not affect their selections of appellant in the photo array, and all identified appellant in court as the person who robbed TK Sports Bar. Our own review of the photo array, which is in the record on appeal, shows that the two photographs at issue are significantly different and not readily identifiable as the same person.

{¶ 79} Furthermore, the trial court gave the jury general instructions regarding the value of identification testimony and credibility of identification witnesses, which specifically asked the jury to consider whether each identification witness had the opportunity to make a reliable observation and specified that the jury could take into account the strength of the identification and the circumstances under which the identification was made. Such a general credibility instruction allows a jury to assess the value of photo identification testimony. *Thompson* at ¶ 24 (finding no plain error occurred in trial court's failure to give a R.C. 2933.83(C)(3) instruction where jury received a general credibility instruction and heard sufficient testimony regarding the identification); *Wells* at ¶ 100 (finding no plain error in trial court's failure to give a R.C. 2933.83(C)(3) instruction where a general credibility instruction "provided guidance to the jury to consider the circumstances surrounding the identification"). Therefore, appellant's substantial rights were not affected, and for all the above reasons, we find no plain error.

{¶ 80} Accordingly, appellant's fourth assignment of error is overruled.

## IV. CONCLUSION

{¶ 81} Having overruled appellant's four assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

KLATT, J., concurs.
DORRIAN, P.J., concurs in judgment only.

_____