[Cite as *State v. Hinton*, 2021-Ohio-4367.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                       CASE NO. 9-19-04

    v.

LLOYD HINTON, JR.,                           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 18-CR-0402

Judgment Affirmed

Date of Decision:    December 13, 2021

APPEARANCES:

    *William T. Cramer* for Appellant

    *Nathan R. Heiser* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Lloyd Hinton ("Hinton"), brings this appeal from the December 26, 2018, judgment of the Marion County Common Pleas Court sentencing him to an aggregate 14-year prison term after Hinton was convicted by a jury of Attempted Murder in violation of R.C. 2903.02(A) and R.C. 2923.02(A), a first degree felony, a 3-year attached firearm specification pursuant to R.C. 2941.145, and Illegal Possession of a Firearm in Liquor Permit Premises in violation of R.C. 2923.121(A), a fifth degree felony. On appeal, Hinton argues that there was insufficient evidence presented to convict him, and that his convictions were against the manifest weight of the evidence.

*Background*

{¶2} On August 22, 2018, Hinton was indicted for Attempted Murder in violation of R.C. 2903.02(A) and R.C. 2923.02(A), a first degree felony (Count 1); Felonious Assault in violation of R.C. 2903.11(A)(1), a second degree felony (Count 2); Felonious Assault in violation of R.C. 2903.11(A)(2), a second degree felony (Count 3); Felonious Assault in violation of R.C. 2903.11(A)(2), a second degree felony (Count 4); Having Weapons While Under Disability in violation of R.C. 2923.13(A)(2), a third degree felony (Count 5); and Illegal Possession of a Firearm in Liquor Permit Premises in violation of R.C. 2923.121(A), a fifth degree

felony (Count 6). Counts 1 through 4 of the indictment all carried 3-year firearm specifications pursuant to R.C. 2941.145. Hinton pled not guilty to the charges.

{¶3} According to the bill of particulars, the charges stemmed from an incident that occurred on July 29, 2018, at approximately 2:20 a.m. at the Gotham City bar in Marion, Ohio. A man named Jashawn was shot twice in the bar by a man with the nickname "Nutso Rambo." (Doc. No. 26). The bill of particulars stated that officers knew "Nutso Rambo" to be Hinton. The victim was life-flighted to Grant Hospital due to the severity of his injuries.

{¶4} Hinton proceeded to a jury trial, which was held December 10-12, 2018. Notably, the State dismissed Counts 4 and 5 of the indictment prior to the jury hearing evidence.

{¶5} Ultimately the jury found Hinton guilty of all of the remaining charges against him, specifically Counts 1-3, and Count 6. The jury also found that Hinton did have a firearm on his person, and that he displayed or brandished it when committing Counts 1-3, satisfying the attached 3-year firearm specification to those charges.

{¶6} On December 21, 2018, Hinton's sentencing hearing was held. The trial court determined that the Felonious Assaults in Counts 2 and 3 merged with the Attempted Murder in Count 1. The State elected to proceed to sentencing on Count 1, the Attempted Murder, along with the remaining, unmerged Count 6,

Illegal Possession of a Firearm in Liquor Permit Premises. Hinton was ordered to serve 10 years in prison on the Attempted Murder, 3 years in prison on the attached firearm specification, and 12 months in prison on the Illegal Possession of a Firearm in Liquor Permit Premises conviction. Those prison terms were ordered to be served consecutively for an aggregate 14-year prison term. A judgment entry memorializing Hinton's sentence was filed December 26, 2018. It is from this judgment that Hinton appeals, asserting the following assignments of error for our review.[1]

**Assignment of Error No. 1**
**Appellant's due process rights were violated by convictions that were not supported by sufficient evidence.**

**Assignment of Error No. 2**
**The weight of the evidence does not support appellant's convictions.**

*First Assignment of Error*

{¶7} In his first assignment of error, Hinton argues that there was insufficient evidence presented to convict him. More specifically, Hinton argues that there was no evidence specifically identifying him as the shooter of the victim in this matter.

---

[1] Hinton originally filed a timely notice of appeal; however, his attorney failed to file a brief and failed to order a transcript of the proceedings. For these reasons, we initially dismissed Hinton's appeal; however, we granted Hinton's application to reopen his appeal due to the *per se* ineffectiveness of his original attorney in failing to prosecute the appeal.

## Standard of Review

{¶8} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, ¶ 6. Therefore, our review is de novo. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3. In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

## Controlling Statutes

{¶9} In this case, Hinton was convicted of Attempted Murder in violation of R.C. 2923.02(A) and R.C. 2903.02(A), and Illegal Possession of a Firearm in Liquor Permit Premises in violation of R.C. 2923.121(A). The Attempt statute, R.C. 2923.02(A), reads:

> **No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.**

The Murder statute, as charged in this case, R.C. 2903.02(A), reads as follows:

**No person shall purposely cause the death of another[.]**

{¶10} The Illegal Possession of a Firearm in a Liquor Permit Premises statue, as charged in this case, R.C. 2923.121(A), reads as follows:

> **No person shall possess a firearm in any room in which any person is consuming beer or intoxicating liquor in a premises for which a D permit has been issued under Chapter 4303. of the Revised Code or in an open air arena for which a permit of that nature has been issued.**

{¶11} Finally, Hinton was convicted and sentenced for a firearm specification attached to the Attempted Murder pursuant to R.C. 2941.145(A), which requires the factfinder to determine that

> **the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense.**

Evidence Presented

{¶12} On July 28-29, 2018, Nathaniel H. was working as a bouncer at the back door of the Gotham City bar in Marion, Ohio.[2]  Generally, Nathaniel used a handheld metal detector to "wand" patrons who entered the establishment's rear entrance, checking them for weapons.

{¶13} Around 2:13 a.m. on July 29, 2018, Nathaniel left his post near the back door and walked to the opposite end of the bar to check on a fight that was

---

[2] According to the owner, the bar was permitted to stay open until 2:30 a.m. under a "D5" permit.

occurring toward the front of the business. While Nathaniel was away from the back door, multiple people were observed on the bar's security cameras entering without being checked for weapons. One of the individuals who entered the bar was a black male wearing a gray, unzipped hooded sweatshirt with a white t-shirt underneath. He also had on a white hat with a black bill, backward. There were roughly forty people in the bar at the time the individual entered.

{¶14} Approximately two minutes after Nathaniel had left his post, he returned to the back of the bar. After he did, he noticed the individual in the gray hooded sweatshirt with the white hat, which was a Chicago Bulls hat. Nathaniel knew the man as "Nutso" but did not know his real name. He had seen "Nutso" before, and, according to Nathaniel, "Nutso" had never caused any problems. Nathaniel actually recalled checking "Nutso" for weapons earlier in the night, but the video surveillance was clear that Nutso reentered the bar through the rear while Nathaniel was away.

{¶15} A few minutes after returning to the back of the bar, at approximately 2:19 a.m., Nathaniel saw "Nutso" standing face to face with a man Nathaniel did not know, later identified as the shooting victim, Jashawn R. Nathaniel observed "Nutso" and Jashawn "saying words, and then shit broke loose." (Tr. at 273). Nathaniel and "Nutso" could be seen facing each other on the surveillance video

because both were wearing white hats, even though they were at the opposite end of the bar from the camera.

{¶16} When Nathaniel observed the commotion, he started walking toward "Nutso" and Jashawn. He was only a few feet away from them, behind "Nutso" and facing "Nutso's" back, when Nathaniel saw "Nutso" with "one hand in the air, one hand at the hip." (Tr. at 279). Nathaniel then heard two loud gunshots coming from directly in front of him where "Nutso" was standing. Nathaniel testified he did not recall seeing a firearm.

{¶17} Jashawn was shot twice—once in the stomach, and once in the arm. After the shots were fired, Nathaniel shoved "Nutso" from behind. Many of the bar patrons dove to the ground or ran. A bartender testified at trial that the gunshots were very loud and distinct. She called 911 just after the shots were fired.

{¶18} On the surveillance video, as chaos erupted following the fired shots, "Nutso" could be seen being taken to the ground by a man in a red shirt, who was later identified as the victim's brother. At that time, "Nutso" lost his hat. The man in the red shirt chased "Nutso" out of the back door. An altercation can be seen just outside the back door on the security camera, but due to the distance it is difficult to discern what is happening. Regardless, less than 30 seconds after going out the back door, the man Nathaniel identified as "Nutso" came back into the bar and left

through the front door. The man in the red shirt tried to follow "Nutso," but the man stumbled and fell repeatedly.[3]

{¶19} At trial, Nathaniel identified Hinton in court as the man he knew as "Nutso." In addition, shortly after the incident Nathaniel was shown a photo array and he identified Hinson as the shooter with one-hundred percent confidence. However, Nathaniel did acknowledge that he initially told law enforcement that he thought "Nutso's" real name might have been "Chance." Further, while Nathaniel stated at trial that he did not see a gun, he had previously stated that he saw a black, semi-automatic pistol.

{¶20} Surveillance footage from multiple cameras in the bar was played at trial, and still photographs were taken from the videos and shown to the jury. The actual shooting cannot be seen on any of the videos because the shooting was toward the back of the bar, a good distance from the best camera view, and there were other patrons in the way. However, the two men standing face to face, "Nutso" and the shooting victim, can be observed in the video just before the shooting. Patrons can be seen taking cover after the shooting, and the initial scuffle between "Nutso" and the man in the red shirt can be observed.

{¶21} The first law enforcement officer to arrive on scene was in the bar less than 90 seconds after the shooting. More officers soon responded in addition to

---

[3] This could be, perhaps, a result of being struck in the back by a barstool by another patron when he chased "Nutso" outside.

EMTs. Jashawn was treated briefly at the scene with bandages and a tourniquet then transported to Marion General Hospital. Due to the nature of the gunshot wounds, and the care required, Jashawn was life-flighted to Grant Hospital.

{¶22} The scene at the bar was secured and law enforcement investigated the matter. No bullet casings were ever located. Law enforcement testified that this could be because a revolver was used or because the casings were picked up, or because they were possibly kicked around and never located. Hinton's Chicago Bulls hat was left at the scene. Hinton stipulated at trial that the Chicago Bulls hat left at the scene was his, and that he was wearing it at the time of the incident.

{¶23} As part of the investigation, a photo array was shown to another Gotham City bar bouncer, who was working the front door of the Gotham City bar. He identified two *different* suspects in the lineup with 50% confidence, and did not identify Hinton at all.

{¶24} The victim, Jashawn, testified at trial that he was at the Gotham City bar with his two brothers when the incident occurred. He testified that he got shot in his arm and his stomach. However, he testified that he did not recall if he was in an altercation, that he did not recall where he was in the bar when he was shot, that he did not recall being transported to the hospital, and that he did not recall being life-flighted to Grant Hospital. When he was asked if he recalled anything about the man who shot him, the following exchange occurred:

> **[Jashawn].** Let me say it like this. You all got the video, right?
>
> **[Prosecutor].** We have the video.
>
> **[Jashawn].** So I feel as though you all got enough information to know who shot me. Like I told you, I ain't want to be in court in the first place. The only reason why I'm in court is because I had to go to jail. If I wouldn't have had to go to court, I wouldn't be here.

(Tr. at 249).

{¶25} Jashawn was shown a photograph of Hinton from the bar before the shooting and asked if he knew Hinton. Jashawn testified that he had "seen him before out on the streets." (*Id.* at 249). However, Jashawn testified that he did not know who Hinton was, and that he did not recall if he had contact with Hinton on July 29, 2018. Jashawn also stated, "You got the video, so I shouldn't have to say who shot me. I'm sure they know. I ain't got to say shit." (*Id.* at 250). Regarding his injuries, Jashawn testified that a bullet was still in his stomach, causing him difficulty with walking, urinating, and defecating.

{¶26} The doctor who treated Jashawn's injuries at Marion General Hospital before he was life-flighted to Grant Hospital testified to the dangers of gunshot wounds and the risks of death. Before Jashawn was transported, the doctor saw some concerning signs with Jashawn's vitals.

{¶27} In addition to the evidence already stated, the prosecution presented the testimony of numerous law enforcement officers who responded to the scene

and investigated the matter. Multiple body camera videos from the night showing the establishment and the victim outside the bar were entered into evidence. A paramedic who responded to the scene testified. Numerous photographs of the victim and the bar scene were entered into evidence.

{¶28} Finally, a brief interview with Hinton was introduced into evidence. During the interview, Hinton denied being in a fight at the Gotham City bar and he denied shooting anyone. He claimed that he was checked for weapons when he initially came into the establishment, that he had "never heard" of the victim, and that he had a "lot of hats" when asked whether he owned a Chicago Bulls hat.

Analysis

{¶29} On appeal, Hinton argues that this case "boils down to the identity of the shooter." (Appt.'s Br. at 10). He does not contest that *someone* brought a gun into the bar and shot the victim; rather, he argues that the State failed to present sufficient evidence to establish that *Hinton* was the individual who shot the victim.

{¶30} In support of his argument, Hinton contends that the surveillance videos did not show the shooting, that they did not show a muzzle flash, and that they did not specifically show anyone firing a gun. Further, Hinton argues that the bouncer, Nathaniel, never saw Hinton with a gun, and that the victim refused to identify Hinton as the shooter. Hinton contends that absent direct evidence that he was the shooter in this matter, the State failed to meet its burden.

**{¶31}** However, contrary to Hinton's argument, there was a significant amount of circumstantial evidence presented establishing that he was the shooter in this matter. While Hinton emphasizes the purported lack of *direct* evidence, "'Circumstantial evidence and direct evidence inherently possess the same probative value * * *.'" *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, ¶ 112, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. Further, "It is * * * well-settled under Ohio law that a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988).

**{¶32}** In this case, Hinton was observed having at least a verbal altercation with the victim immediately prior to the shooting. At the time of the shooting, Hinton and the victim were facing each other. Hinton was observed to have one hand raised and one hand by his side just before the gunshots were heard. According to Nathaniel, the bouncer, the gunshots came from directly in front of Nathaniel where Hinton was standing and facing the victim.

**{¶33}** Moreover, Nathaniel identified Hinton as the shooter in a photo array with one hundred percent certainty. At trial, he identified Hinton as the man he was describing as "Nutso." While Nathaniel did not specifically see Hinton with a gun, what he did see and hear, which was corroborated to an extent by the security cameras in the bar, represented overwhelming circumstantial evidence that Hinton

was the shooter in this matter. Similar circumstantial evidence has been held to be sufficient to show the identity of a shooter. *See State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722.

{¶34} In sum, we find that sufficient evidence was presented for a reasonable factfinder to determine beyond a reasonable doubt that Hinton was the shooter in this matter. Notably, in his brief, Hinton does not challenge any of the other elements of his crimes. However, a review of the record and the evidence establishes that all of the remaining elements were satisfied as well, thus even if Hinton did challenge the other elements, the challenges would not be well-taken. For all of these reasons, Hinton's first assignment of error is overruled.

*Second Assignment of Error*

{¶35} In his second assignment of error, Hinton argues that even if there was sufficient evidence presented to convict him, his convictions were against the manifest weight of the evidence.

Standard of Review

{¶36} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, " 'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier-of-fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier-of-fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Analysis

{¶37} In his second assignment of error, Hinton reiterates his challenges to the identity of the shooter in this matter, asserting the same arguments he made in the first assignment of error. He contends that even if the evidence was sufficient to establish that he was the shooter in this matter, the jury's determination that he was the shooter was against the manifest weight of the evidence.

{¶38} As we stated in the previous assignment of error, there was a significant amount of circumstantial evidence establishing Hinton as the shooter in this case through the video surveillance and Nathaniel's testimony. Nevertheless, beyond what was already cited in the previous assignment of error, there was also the testimony of the victim in this matter and the interview with Hinton for the jury

to evaluate. The jury could have determined based on the victim's actions and statements while testifying at the trial that the victim did not want to name Hinton in the courtroom as the shooter, and the jury could have readily found Hinton's denials in his interview to be disingenuous. We will not second-guess a jury's credibility determinations. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶39} Regardless, given the evidence presented, all reasonable inferences establish that Hinton was, in fact, the shooter in this matter. At the very least we could not find that the jury clearly lost its way in making such a determination, or that a manifest miscarriage of justice occurred in this matter. Thus after reviewing the evidence and the record in its entirety, we cannot find that Hinton's convictions were against the manifest weight of the evidence, and his second assignment of error is overruled.[4]

*Conclusion*

{¶40} For the foregoing reasons, Hinton's assignments of error are overruled and the judgment and sentence of the Marion County Common Pleas Court is affirmed.

**Judgment Affirmed**

**WILLAMOWSKI, P.J. and MILLER, J., concur.**

---

[4] Again, Hinton does not challenge any of the other elements of his crimes in his brief; however, even if he did, the evidence supports the remaining elements of the convictions and the convictions are not against the manifest weight of the evidence.